222 N.J. Super. 567 (1988)
537 A.2d 756
CARMEN J. MAGGIO AND EDYTHE MAGGIO, HIS WIFE, PLAINTIFFS-RESPONDENTS,
v.
STUART PRUZANSKY AND HERMYNE PRUZANSKY, HIS WIFE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted January 19, 1988.
Decided February 18, 1988.
*569 Before Judges PETRELLA, BAIME and ASHBEY.
McOmber & McOmber attorneys for appellants (J. Peter Sokol of counsel and on the brief).
Ravin, Greenberg & Zackin attorneys for respondents (Allan M. Harris of counsel and on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
This appeal involves a dispute between neighbors as to their common property boundary line. The trial judge, after a bench trial, entered judgment for plaintiffs Carmen J. and Edythe Maggio with respect to a strip of land running parallel to a masonry retaining wall which was entirely on the property of the adjoining owners, defendants Stuart and Hermyne Pruzansky. The Pruzanskys appeal, arguing that the trial judge misinterpreted Mannillo v. Gorski, 54 N.J. 378 (1969), and failed to apply that case correctly when he concluded that the "encroachment"[1] was a major, rather than a minor one. Defendants *570 also argue on this appeal that the trial judge erroneously assumed that the dividing line was open and notorious.
The facts are not complicated. Unfortunately, the neighbors were unable to resolve their differences over a relatively small strip of land which defendants might rarely have been called upon to use either for maintenance of their wall or in any other fashion, although it might affect side yard requirements under the zoning ordinance. The matter was tried over a period of three days.
The Maggios own the property at 25 Witherspoon Road in Clifton, New Jersey (Lot 32, Block 74-4 on the tax map) on which is situated a one-story frame dwelling. They purchased this property in 1972 and obtained a survey of those premises. The Pruzanskys live in a one-family residence at 19 Witherspoon Road (Lot 33, Block 74-4) which they purchased in or around 1983.
The Maggios filed a complaint on September 3, 1985 seeking various relief. They claimed title to the disputed strip alternatively by deed and by adverse possession. They also asserted claims of trespass on that strip and intentional destruction by the Pruzanskys of their personal property thereon. The Pruzanskys denied the allegations of the complaint and counterclaimed against the Maggios, asserting their entitlement to the strip and alleging trespass on the part of the Maggios. The claim by the Maggios for title by deed was dismissed on summary judgment since their 1972 deed did not include the disputed strip of property. After a three-day trial the judge awarded adverse possession to the strip to the Maggios and dismissed all their other claims as well as the counterclaim, with prejudice.
The Maggios purchased their property by deed dated September *571 26, 1972 from the Gilmans[2] who had lived there from on or about August 14, 1957. The 1972 survey obtained by the Maggios, the 1957 deed under which the Gilmans took title, and the deed to the Maggios, did not refer to the wall (the record is not clear as to when that was constructed, but presumably it was about the time when the house was built in which the Pruzanskys presently reside). Both deeds recite that they are subject to "any state of facts which an accurate survey may show."
In 1983 the Maggios had a swimming pool installed and in connection therewith erected a four foot high chain-link fence around the pool on the rear half of the property. Propane tanks, apparently portable from the depiction in the photographs, were also placed on the property for use with the pool. Apparently the Pruzanskys took title in 1983 from a family named Matzler[3] and undertook extensive renovations which took about six months, before they moved in around June 1984  which is about a year after the Maggios had installed the pool, fence and propane tanks. The common line between the Maggio property on its westerly side and the Pruzansky property on its easterly side runs 152.13 feet from street to rear property line. A masonry wall[4] retains the soil on the higher elevated Pruzansky property and starts at about two to four inches above the ground at the front of the property (and some 1.18 foot clear of the westerly property line), rises to a height *572 of about 44 inches in the middle of the property line (where the wall is clear of the line by about 1.4 feet) and then drops off to a height of about four to ten inches at the rear where it is about 1.9 feet clear of the line. Except for the trial judge's decision on adverse possession, it is indisputable, based on the deeds and surveys in evidence, that the wall is entirely placed on the property of the Pruzanskys, but not at a uniform distance.
A survey dated February 5, 1986 of the Pruzansky property shows that the Maggios' four foot high chain-link fence intruded over the westerly property line onto the Pruzanskys' property by some 1.13 feet at the front and 1.35 feet at the rear. It also showed the two small round metal propane tanks, apparently portable and refillable, on the line and intruding over the line.
The surveyors found the iron boundary line marker pipes which had at some earlier time been placed at the front and rear on the common property line. Presumably they were on the property back in 1957 when the Gilmans had purchased it since the stakes are at the same point where the property lines are shown on the May 5, 1972 survey of the Maggio property obtained at the time the Maggios purchased their house. The retaining wall is not shown or delineated on that May 5, 1972 survey.
The survey obtained by the Pruzanskys dated, February 5, 1986, shows what is the true deed course and distance of the dividing line between the subject properties. The line was also shown on a filed subdivision map for the "College Croft Development." This survey shows the masonry wall and encroachments into the Pruzansky property by the Maggios' chain-link fence at the rear of the property and the two small propane tanks which also intruded slightly into the one-foot strip east of the masonry retaining wall. Pruzansky testified that the distance from the side of his house to his property line on the west, including the strip east of the wall, was 12 feet and that if *573 he did not have that strip area, he would not be in compliance with the side-yard requirements of the Clifton zoning ordinance.
Mr. Maggio testified that when they moved into the property in 1972, the Matzler family lived next door. There was never any discussion or dispute between them concerning the location of the wall or any property on the side of the wall next to the Maggio property. Maggio testified that when he purchased the property from Mrs. Gilman he "assumed" he owned to the wall and had maintained it by cutting the grass, mulching and planting flowers. Due to the unavailability of Mrs. Gilman for the trial, her deposition was read into evidence. She said that she had maintained the one-foot strip as a part of her yard and had cut the grass up to the wall, planted flowers in that area (they never planted shrubs or bushes), and had maintained a vegetable garden for a time at the very rear portion which apparently went up to that wall on one side. She also said that she never had any discussion with the Matzlers about the actual property line. She was unaware whether the Matzlers realized the actual location of the dividing line. The Gilmans never made a claim of adverse possession of that property.
Maggio testified that it was his "understanding" that he owned the property "Right up to that wall, up to and including that wall." He appeared at that point to claim that he thought that he owned the entire wall and for the entire length of the property. He claimed he got that impression from the Gilmans who were his predecessors in title.
The Maggios argue that the Matzlers, the family from whom the Pruzanskys obtained title, never complained about them using the property right up to the wall after the pool was constructed in mid-1983 until the date of sale to the Pruzanskys which was apparently in late 1983. Obviously the Matzlers were not there for very long after the pool was built.
As previously noted, the trial judge dismissed all claims on both sides except for the adverse possession claim of the Maggios for the one-foot strip of property on their side of the *574 retaining wall. No claim was actually asserted by the Maggios for the wall, notwithstanding Maggio's testimony and "understanding."
The trial judge concluded that adverse possession sufficient to change title had been established. He said in his oral opinion of September 30, 1986:
Mr. Pruzansky was under the mistaken belief especially after he had the survey done by the surveyor that he was under the mistaken[5] belief that this property [the one-foot strip] was his. I don't believe that his action from the testimony that I've heard was willful, ... wanton, ... deliberate. He was an individual who was acting in good faith and he went upon property that he thought was his own property and he wanted to take control of that property.
The judge found no bad faith or malice on the part of Mr. Pruzansky and no basis to assess either punitive or compensatory damages. The judge then discussed the question of adverse possession in relation to the case of Mannillo v. Gorski, supra, quoting Justice Haneman:
Accordingly, we discard the requirement that the entry and continued possession must be accompanied by a knowing intentional hostility and hold that any entry and possession for the required time which is exclusive, continuous, uninterrupted, visible and notorious, even though under mistaken claim of title, is sufficient to support a claim of title by adverse possession. [54 N.J. at 386-387]
The trial judge in this case then applied that language to conclude that the Pruzanskys should be divested of title to the strip because he tacked on the activities of the Gilmans to that of the Maggios and concluded that measured from 1957, and for at least 20 years, the property had been openly maintained by the owners of the lot to the east of the Pruzansky property. The judge also concluded, "from what I can gather from Gilman's testimony, Matzlers too assumed that their property line was to the wall." Such an assumption is without foundation in the record and cannot be permissibly based upon the deposition testimony and assumptions of Mrs. Gilman which had been read into evidence. She had admitted in the depositions *575 that when she and her husband took title in 1957, they had obtained a survey but that they did not look at it and did not look for stakes in the ground.
The trial judge did recognize that there was an exception or caveat in the Mannillo case. Justice Haneman had noted immediately after the above quotation:
However, this conclusion is not dispositive of the matter sub judice. Of equal importance under the present factual complex, is the question of whether defendant's acts meet the necessary standard of `open and notorious' possession. It must not be forgotten that the foundation of so-called `title by adverse possession' is the failure of the true owner to commence an action for the recovery of the land involved, within the period designated by the statute of limitations.
* * * * * * * *
In order to afford the true owner the opportunity to learn of the adverse claim and to protect his rights by legal action within the time specified by the statute, the adverse possession must be visible and notorious. In 4 Tiffany, supra (Supp. 1969, at 291), the character of possession for that purpose, is stated to be as follows: `* * * it must be public and based on physical facts, including known and visible lines and boundaries. Acts of dominion over the land must be so open and notorious as to put an ordinarily prudent person on notice that the land is in actual possession of another. Hence, title may never be acquired by mere possession, however long continued, which is surreptitious or secret or which is not such as will give unmistakable notice of the nature of the occupant's claim.' [Id. at 387-388] (emphasis supplied).
The trial judge quoted from the exception to Mannillo:
However, when the encroachment of an adjoining owner is of a small area and the fact of an intrusion is not clearly and self-evidently apparent to the naked eye but requires an on-site survey for certain disclosure as in urban sections where the division line is only infrequently delineated by any monuments, natural or artificial, such a presumption is fallacious and unjustified [citation omitted]. The precise location of the dividing line is then ordinarily unknown to either adjacent owner and there is nothing on the land itself to show by visual observation that a hedge, fence, wall or other structure encroaches on the neighboring land to a minor extent. Therefore, to permit a presumption of notice to arise in the case of minor border encroachments not exceeding several feet would fly in the face of reality and require the true owner to be on constant alert for possible small encroachments. The only method of certain determination would be by obtaining a survey each time the adjacent owner undertook any improvement at or near the boundary, and this would place an undue and inequitable burden upon the true owner. Accordingly we hereby hold that no presumption of knowledge arises from a minor encroachment along a common boundary. In such a case, only where the true owner has actual *576 knowledge thereof may it be said that the possession is open and notorious. [Id. at 388-389]
Mannillo involved neighbors on two relatively small lots. One neighbor had expanded a stoop and extended a concrete walkway 15 inches into the neighboring owner's property. The trial judge concluded in Mannillo that defendant had established possession which was "exclusive, continuous, uninterrupted, visible, notorious and against the right and interest of the true owner" for more than 20 years. Id. at 382. The judge found that the plaintiff had not established a hostile taking, but only a mistaken ownership claim. Ibid. The Court reversed a summary judgment for the plaintiffs who had alleged a trespass and remanded for trial as to whether (1) "the true owner had actual knowledge of the encroachment; (2) if not, whether plaintiffs should be obliged to convey the disputed tract to defendant, and (3) if the answer to the latter question is in the affirmative, what consideration should be paid for the conveyance." Id. at 389. The homeowner was thus not required to remove the steps and walkway which intruded on plaintiffs', property and the trial judge was given an alternate method to resolve this particular neighborhood dispute.
The burden of proof rests on the party claiming title by adverse possession. Patton v. North Jersey Dist. Water Supp. Comm'n, 93 N.J. 180, 187 (1983). After evidence is introduced that the use is "open, continuous, uninterrupted [and] exclusive... for the prescriptive period with the acquiescence of the owner, a presumption arises that the use was adverse except when the land is vacant, unimproved, unenclosed, and the use is casual rather than customary." Ibid.; see Plaza v. Flak, 7 N.J. 215, 222 (1951). Generally, where possession is clear and visible, the true owner is presumed to have knowledge of the adverse occupancy. Mannillo, supra, 54 N.J. at 388. However, mere "assumptions" are not competent proofs. Here, the strip was essentially vacant, unimproved and unenclosed (other than the wall on one side) and the use was casual. Moreover, there is an exception for a minor *577 encroachment. In such a case, the true owners (Pruzanskys) and their predecessors in title must have had actual knowledge of the minor encroachment, even if the encroachment is not hostile, in order for the possession by the Maggios to be open and notorious. Id. at 389. There was no proof that the Matzlers had such knowledge. Furthermore, surveyor's metal stakes located in the ground on the property line were found by the surveyors who surveyed the property in 1972 and thereafter, indicating the true property line.
We generally give deference to the findings of the trial judge in a nonjury trial if those findings are supported by sufficient credible evidence in the record. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974). However, where, as here, the judge's findings went so wide of the mark as to be "clearly mistaken and so plainly unwarranted," then "the interests of justice demand intervention and correction." Formosa v. Equitable Life Assurance Society, 166 N.J. Super. 8, 20 (App.Div. 1979), certif. den. 81 N.J. 53 (1979). As stated in State v. Johnson, 42 N.J. 146, 162 (1964), we hold to a "definite conviction that the judge went so wide of the mark, a mistake must have been made."
In the case before us, there was insufficient evidence to establish an open and notorious encroachment by the Maggios or even their predecessor in title on the adjoining Pruzanskys' property (even while owned by the Matzlers) by grass growing next to the retaining wall and the growing or even planting of flowers partly on that property.[6] Indeed, in light of the slope of the land, it is not clear that the Pruzanskys or their predecessors in title took note of what was growing at the foot of the wall beneath the slope on the easterly side of the wall. The trial judge viewed the retaining wall as a "party wall"[7] and *578 apparently considered it to be a major intrusion. The judge said:
Now in the case before me you have a party wall and in the evidence and the photographs that I have seen that have been introduced into evidence, the wall  and also by testimony, the wall begins at some 10 inches in front and goes four feet high and it actually retains the property of Pruzansky.
It would seem to me that Matzler and it is presumed that Matzler knew  Matzler through the years never said anything to the Gilmans. He had to have knowledge. And this is not in our case, the case before us and the case that I've heard, this is not a minor encroachment. This is an encroachment of some 162 [sic] feet, that if you look at the property and if you look at the photographs you can see the wall.[8] You can see the area where grass is only cultivated up to a certain point and there are 12 inches from that wall. You can see it with the evidence in the photographs that have been presented before me.
The trial judge mistakenly distinguished Mannillo on the grounds that the 12 inch wide and 152 foot long strip in this case could be seen with the naked eye because it was "uncultivated by grass." The judge went on to say:
And, of course, I think that Mr. Pruzansky finds himself in a very, very unfortunate position because whether he had knowledge or not insofar as I see it, it makes no difference because I believe that title had already passed by adverse possession to the Maggios prior to Pruzansky purchasing the property. After all, Matzler owned the property from 1957 until he sold it in 1983 to the Pruzanskys and if you add 20 years to 1957 that would be 1977 when adverse title arose. And I think that I don't have to be too specific about the actual dates because, Mr. Pruzansky bought the property some time in 1983.
The judge's conclusion was erroneous because he disregarded the language in Mannillo which said that where there were no visible property lines but an intrusion of a fence or wall or some other structure to a minor extent, i.e., "not *579 exceeding several feet," (54 N.J. at 388) notice of actual possession was insufficient. Here, the trial judge erroneously labeled the alleged possession by the Gilmans as a major intrusion. Obviously, there was no intrusion by any fence or wall of the Gilmans here. Rather, the only actual possession that the Gilmans exercised was merely planting some flowers and part of a vegetable garden. The "encroachment" by the Gilmans would have been for actually a little more than a foot for a distance of 152.13 feet, i.e. along the common border line, and this falls within the "minor" encroachment concept of Mannillo. The presumption of notice therefore does not apply. The trial judge thus erred in his interpretation of that case. We do not construe the reference in Mannillo to "a few feet" to apply merely to the width of the strip in question, but it would include the entire length of the strip running down the entire border.
The mere fact that there may have been technical trespasses of minor sorts over the years by the Maggios or their predecessor in title does not constitute such an encroachment as to present an obvious case for filing a suit for adverse possession. Prudence would seem to require that any landowner erecting a wall or fence allow some space on the far side of the fence or wall either as a margin for error, or so that footings, concrete bases for fence posts and the like would not intrude even under the neighbor's land. It might also allow for maintenance and repair.[9]
There are numerous adverse possession cases involving mistake or ignorance as to boundaries. See Annot., "Adverse Possession Involving Ignorance or Mistake as to Boundaries," 80 A.L.R.2d 1171 (1961) (1979 and 1987 Supp.). Some jurisdictions adhere to the rule that the intent of a person holding land beyond his true boundary is controlling in determining whether land is held adversely. Id. at 1173-1181 and cases cited therein. *580 Other jurisdictions, now including New Jersey, view occupancy or possession to a visible and ascertainable boundary as the controlling factor in such adverse possession cases. See Mannillo v. Gorski, supra, 54 N.J. at 378; Taylor v. Tripp, 330 N.W.2d 542 (S.D. 1983); Rutland v. George Kraft Co., 387 So.2d 836 (Ala. 1980); Nevin v. Smith, 253 Or. 347, 584 P.2d 251 (1978); Geronimo Hotel, Inc. v. Tucson, 126 Ariz. 446, 591 P.2d 72 (App. 1978).
For example, in Brown Paper Mill Co., Inc. v. Warnix, 222 Ark. 417, 259 S.W.2d 495 (1953), a paper mill sued Warnix over a boundary dispute between each party's 40 acre tract. A 35 foot wide strip of land claimed by both parties was the area in dispute. Warnix owned a fence immediately west of the disputed area and a survey showed that the strip was part of his property. The disputed strip and the mill's adjoining property were unimproved and wild. Warnix's property was used as a pasture. Testimony revealed that a former owner of Warnix's property deliberately built the fence west of the property (not at the edge of the property) in order to leave space for a future road. The court stated:
We agree with the chancellor's conclusion that the mere existence of the fence did not affect the title to the area in controversy. The record does not show that there was ever an agreement upon the fence as the boundary line. A few witnesses testified that they understood the location of the fence to represent the line, but their belief was based merely on the fact that the fence was there and hence added nothing to the physical facts.
On the other hand, there is testimony that Bob Butler, a former owner of the appellee's forty, erected this fence many years ago and deliberately placed it west of his property line in order to leave space for a road on his own land. Of course, a landowner who puts his fence inside his boundary line does not thereby lose title to the strip on the other side. That loss would occur only if his neighbor should take possession of the strip and hold it for the required period of years. [Id. at 495]
The court did not find that the mill had obtained title by adverse possession merely because the strip of land along the fence remained unimproved and wooded, despite the mill's contention that the growing of timber was the only suitable use of the land. Ibid.; see Cossey v. House, 227 Ark. 100, 296 *581 S.W.2d 199 (1956) (true owner placed fence inside his boundary but adjoining owner seeking adverse possession of strip outside fence could not show continuous domain over strip).
"[O]nly where the true owner has actual knowledge thereof [of a minor encroachment] may it be said that possession is open and notorious." Mannillo v. Gorski, supra, 54 N.J. at 389. Here there was never a structure at or near the boundary until the swimming pool was installed. Grass, shrubs, flowers and plants are not generally considered encroachments and even if the true owner saw a small amount of plantings they would hardly give rise to concern or be significant in such cases as involved here.[10] Moreover, they might not have even taken up the entire space because plants obviously had to be planted at least some distance apart and away from the wall. As then Judge Francis (later Justice) said in Predham v. Holfester, 32 N.J. Super. 419, 428-429 (App.Div. 1954) (concurring opinion), certain insignificant encroachments lack the elements of "openness and notoriousness." Id. at 429 (driveway encroachment .30 of foot at one point and .58 of a foot at another). "The statute of limitations is not a club in the hands of the wrongdoer, whether a willful or an unintentional one; it is a prod in *582 the back of the victim, the prod being powered by the conspicious notice of the adverse use." Ibid.
The trial judge's decision here, if applied as a general rule in other cases, would be a trap for the unwary nontrespassing landowner and, unlike the situation in Mannillo where there was a small intrusion of a step and walkway which might not have had to be forfeited, it had the unfortunate result of creating more neighbor and title disputes and the unwitting ceding of whatever inches of property along a common boundary line might be involved in cases where a property owner deliberately, and presumably in good faith, placed his fence on his own property and allowed a few inches leeway in case of error or to avoid offending a neighbor. As the old saying goes, "Good fences make good neighbors." They should not be the beginning of a requirement for constant vigilance. In such situations neighbors and property owners in general should seek sensible accommodations to avoid the necessity of litigation with respect to the use and maintenance of property abutting a neighbor's wall, fence or shrubbery at or near boundary lines.
We conclude that the evidence clearly showed that during 1983-1984 when the Maggios erected their pool that they wrongfully erected the chain-link fence in part in the strip of property belonging to the Pruzanskys and installed propane tanks partially in that same strip. The Pruzanskys, who then only had recently purchased their property, took appropriate and prompt steps to notify the Maggios of this problem, but the Maggios refused to discuss the matter and litigation ensued.
Accordingly, the judgment below is reversed. The matter is remanded to the Law Division with direction to enter judgment for defendants on their counterclaim establishing their entitlement to the strip; canceling of record any judgment or order granting plaintiffs' title to the disputed strip, and affording the counterclaimants appropriate relief with respect to removal of the trespassing property of the Maggios.
NOTES
[1] There was no "encroachment" by defendants' property since defendants had put nothing on the property of plaintiffs. The existence of land belonging to defendants on the side of their wall next to the plaintiffs' property was not an encroachment. The only encroachments, actually trespasses, up until the time of construction of a swimming pool by the Maggios would have been the placement by plaintiffs of some personal property, and the planting of flowers or shrubs in that area.
[2] Although the spelling of the typed name of the grantors in the deed is "Gilmann," it appears that their signatures have a single "n," and all other references in the record are in accord. Hence, we use that spelling herein.
[3] The deed was not in evidence.
[4] The photographs in evidence show a wall with a cut stone face (described in one survey as concrete and veneer) which appears to be almost a foot thick, with stone slabs on the top, and with the Pruzanskys' lawn sloping downward on their side of the wall to the top of the slabs. The wall was obviously meant to retain the soil on the Pruzansky property which is at a higher level than the property to the east.
[5] His belief was not mistaken in relation to the deeds or surveys. This would only be accurate after ownership by adverse possession had been obtained.
[6] The fence and propane tanks would be a different matter, but they were not on the property until 1983.
[7] See Black's Law Dictionary, 1011 (5th ed. 1979).
[8] It is unclear, but the trial judge may have viewed the existence of the strip of land owned by the Pruzanskys' predecessor in title as an encroachment on Maggios' property. He said it was "not a minor encroachment ... an encroachment of some 162 [152.13] feet." Merely because the Pruzanskys' predecessor in title left some of his land on the far side of his wall did not constitute an encroachment on Maggios' property or a basis to start the running of an adverse possession statute. This case is more the converse of the usual wall encroachment case where the wall is over the boundary line. If anything, the language in Mannillo v. Gorski, supra, 54 N.J. at 388-389, regarding situations excepted from the presumption of notice principle would apply.
[9] Moreover, a retaining wall is not necessarily meant to act as a wall delimiting a boundary line.
[10] The mere fact of growing flowers on disputed property does not establish an open and notorious claim, particularly if minimal as here. Cultivation has generally referred to more extensive farming, but it varies with the type, location and condition of the land. It need only be consistent with the nature of the property and its most reasonable use so as to indicate ownership. Various cases held that mere cultivation is insufficient because the property in question could have been used for more extensive use. See City of Tonawanda v. Ellicott Creek Homeowners Ass'n, 86 A.D.2d 118, 449 N.Y.S.2d 116, 120 (1982) (claimants "merely assert that they have maintained the creek-front land by mowing the grass and planting trees"  held insufficient as a matter of law); Flickinger v. Huston, 291 Pa.Super. 4, 435 A.2d 190, 193 (1981) (evidence of adverse possession insufficient); Bailey v. Mahr, 199 Neb. 29, 255 N.W.2d 866, 869 (1977) (maintenance of garden insufficient). But see Wilson v. Moore, 335 P.2d 1085 (Okla. 1959) (adverse possession when fence inside boundary and adjacent owner cultivated property, and retained crops from property up to fence).