882 A.2d 374 (2005)
380 N.J. Super. 302
Ronald MARX, Iyad Khawaja, Samer Abualouf, Ibrahim Abushawar, Joseph C. Limoli and James Morrissey, Plaintiffs-Appellants,
v.
FRIENDLY ICE CREAM CORPORATION, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted March 15, 2005.
Decided August 31, 2005.
*375 Aslan T. Soobzokov, Paterson, attorney for appellants Iyad Khawaja, Samer Abualouf, Ibrahim Abushawar and Joseph C. Limoli.
Littler Mendelson, attorneys for respondent (Eric A. Savage, of counsel; Jessica S. Boar, New York, NY, on the brief).
Before Judges SKILLMAN, GRALL and GILROY.
The opinion of the court was delivered by
GRALL, J.A.D.
Plaintiffs appeal following a non-jury trial in this action to recover overtime pay pursuant to N.J.S.A. 34:11-56a4 and N.J.S.A. 34:11-56a25.[1] Employers are not obligated to pay overtime to workers who serve in an "executive capacity," N.J.S.A. 34:11-56a4, and this case requires us to consider the scope of the exemption for "executives" that is defined and delimited in N.J.A.C. 12:56-7.1. We conclude that the trial court's decision is supported by adequate evidence and consistent with N.J.A.C. 12:56-7.1.
Plaintiffs Iyad Khawaja, Samer Abualouf and Joseph C. Limoli are general managers of restaurants owned by defendant Friendly Ice Cream Corporation (FICC).[2] *376 They claim that the trial court erred in concluding that they are ineligible for overtime because they are employed in an "executive capacity," within the meaning of N.J.S.A. 34:56a4 and N.J.A.C. 12:56-7.1.
Plaintiff Ibrahim Abushawar is an assistant manager employed by FICC. The issue he raises on appeal is unrelated to the issue raised by the other plaintiffs. Abushawar's claim for overtime was dismissed on FICC's motion for summary judgment, and he does not challenge that ruling. Abushawar appeals from an order granting FICC's motion for costs and fees pursuant to R. 4:58-3. We affirm that order.
In parts I-IV of this decision, we address the evidence and law relevant to the overtime claim raised by the plaintiffs who are general managers.[3] We address Abushawar's distinct claim in part V of this decision.

I.
FICC owns and franchises the restaurants known as "Friendly's." Each restaurant does three types of business  sale of prepackaged ice cream products, take-out service, and restaurant service. Uniform quality of products and service and profitability throughout the chain of restaurants are important to FICC. The corporate goal is to develop consistency to the point that customers expect that they will get specific food, prepared and served in a specific way whenever they go to a Friendly's restaurant. To that end, FICC sets menus, prices, and specific procedures designed to ensure courteous and prompt service of quality food and prevent waste through spoilage, oversized-portions and theft. To promote uniformity, FICC has developed manuals and check lists for daily, weekly and monthly tasks in its restaurants. Every Friendly's restaurant has one general manager who has overall responsibility for management of the facility, supervision of the staff and implementation of all FICC policies and procedures.
Abualouf was the general manager of defendant's Ramsey restaurant from 1999 to 2001, and Limoli managed the Bloomfield restaurant between March 2001 and May 2002. Khawaja was promoted to the position of general manager in 1996, and at the time of trial he was working as the general manager of the Bloomfield restaurant. All three plaintiffs had a minimum of eighteen employees on staff at all relevant times. FICC policies require a minimum of three employees in attendance during hours of operation.
The starting salary for a general manager is $40,000 per year and the maximum salary is $65,000. A fifty-hour workweek is expected, and bonuses are available based upon the performance of staff and profitability of the restaurant. When the general manager is not present, either the assistant manager or guest service supervisor assumes the role of the general manager, but the general manager retains responsibility for the correct and profitable operation of the restaurant, and the general *377 manager is expected to review the management work done in his or her absence.
FICC pays its assistant managers at an hourly rate of $13.39 per hour, and they receive overtime pay for any hours over forty per week. Guest service supervisors, cooks, and servers are paid less than assistant managers and are also eligible for overtime. Each general manager reports to a district manager who visits the district's restaurants at his or her discretion and when needed.
General managers hire, train, supervise, evaluate and schedule hours for members of the restaurant staff. They have the authority to fire staff members in accordance with FICC's progressive discipline policy. Approval of the district manager is required for termination of an assistant manager or guest services supervisor, but the general manager's recommendation is generally followed.
General managers are also responsible for ordering the food and supplies, determining the quantity of perishable food to ready in advance of each shift, and ensuring that the various stations in the restaurants are properly equipped before each shift. They pay the restaurant's bills, analyze profit and loss statements and prepare or oversee the preparation of payroll.
The general manager must enforce FICC's waste and theft prevention procedures by: locking the kitchen door at all times; checking discarded containers to avoid waste; monitoring portion size; auditing customer checks to ensure proper charging; counseling servers when a customer leaves without paying; and charging employees for food they consume.
Oversight of maintenance of the restaurant facility is left to the general managers. Parking lots, tables and work stations must be kept clean. Appliances must be clean and operable.
The general managers must ensure the quality of food and service. They are expected to prevent service of food that does not meet standards of quality and appearance. Meals or desserts that are substandard are to be discarded and reported as waste. Food supplies must be dated to avoid service of spoiled food. There are time goals for serving customers, and general managers are expected to "lend a hand" if necessary to relieve a "bottleneck" during peak hours.
General managers are also responsible for sales promotion within the restaurant. They are required to train servers to promote sales by using techniques such as asking customers if they would like to add toppings to ice cream and suggesting purchase of a larger portion or a side dish. FICC sends "mystery guests" to its restaurants: they report to FICC on service and food quality, and FICC uses the reports to identify problems and develop the performance ratings which are used in awarding bonuses.
While plaintiffs describe the general manager's job as one involving constant supervision of staff, they claim that FICC's mandatory menus, prices, detailed procedures and check lists leave no room for their meaningful exercise of discretion. Plaintiffs testified that they work as many as sixty to seventy hours per week and devote only fifteen to twenty percent of that time to managerial responsibilities. On a regular basis, they clean bathrooms and tables, vacuum and mop, defrost, unload food supplies, police the parking lot, and cook and serve food. As plaintiffs see it, they are required to devote their time to work that should be done by their staff because FICC sets the labor component of their budget at an amount too low to permit them to schedule enough workers to get the job done.
*378 Michael Maglioli, former vice president of restaurant operations for FICC, explained the relationship between a restaurant's labor budget and staffing decisions. FICC utilizes a computer program that projects staffing levels based on recent sales. The program is sensitive to the type of sales  prepackaged, take-out or restaurant service  because the labor required varies depending upon the nature as well as the volume of sales. Maglioli explained that general managers are expected to schedule in accordance with the computer's projection of needs and to exercise their discretion to adjust for external factors the program does not consider  for example, school holidays that tend to bring increased business. A general manager has the discretion to exceed the labor budget. The budget represents the target for expenditures on labor costs not a ceiling. The budget is a planning tool designed to maintain a positive ratio between costs and profits. Maglioli did not know of one case in which a general manager had been terminated on account of exceeding the projected labor budget and noted that FICC as a whole generally exceeds the labor component of the budget. A general manager's failure to meet the labor budget is not determinative of his or her bonus, but labor costs are relevant to the restaurant's profitability, which is taken into consideration in determining eligibility for bonus.
FICC considers its general managers to be "executives" who are not entitled to overtime pursuant to N.J.S.A. 34:11-56a4. Plaintiffs have not been paid overtime for any of their work as general managers.
On the basis of the foregoing evidence the trial court concluded that plaintiffs were employed in an "executive capacity" and ineligible to claim entitlement to overtime compensation under N.J.S.A. 34:11-56a4 and N.J.A.C. 12:56-7.1.

II.
An employer's obligation to pay overtime wages is a component of New Jersey's minimum wage law (MWL), N.J.S.A. 34:11-56a to -56a30. The MWL was enacted "to establish a minimum wage level for workers in order to safeguard their health, efficiency, and general well-being.. . ." N.J.S.A. 34:11-56a. It is patterned on the federal Fair Labor Standards Act (FLSA), 29 U.S.C.A. §§ 201-219. Both the FLSA and the MWL require an employer to pay an employee who works more than forty hours per week at a rate of one-and-one half times the employee's regular hourly rate for every hour after the fortieth, unless the employer establishes the right to an exemption from the "overtime" obligation based upon the employee's salary, duties and work. N.J.S.A. 34:11-56a4; N.J.A.C. 12:56-7.1 to -7.6; 29 U.S.C.A. § 207; 29 U.S.C.A. § 217; 29 C.F.R. §§ 541.0-541.602 (2004). Both laws provide an exception for any employee who works in a "bona fide executive capacity." N.J.S.A. 34:11-56a4; 29 U.S.C.A. § 213(a)(1).
State minimum wage laws that are more protective of workers than federal law are authorized by the FLSA. 29 U.S.C.A. § 218(a). On that basis, this court has held that the FLSA does not preclude states from extending its protection to a greater number of employees by narrowing the group of employees excluded from the law. Yellow Cab Co. of Camden v. State, Dir. of Wage & Hour Bureau, 126 N.J.Super. 81, 91-92, 312 A.2d 870 (App.Div.1973), certif. denied, 64 N.J. 498, 317 A.2d 711 (1974). Based upon the Legislature's remedial purpose in enacting a minimum wage law, we have held that all exemptions to N.J.S.A. 34:11-56a4 should be construed narrowly and that the employer has the obligation to prove that *379 an employee meets the criteria for exemption. Id. at 86, 312 A.2d 870.
Under both the FLSA and MWL, the criteria for exempting an employer from the obligation to pay overtime to an employee who serves in a "bona fide executive capacity" is set forth in regulations promulgated by the head of the Department of Labor. N.J.A.C. 12:56-7.1; 29 C.F.R. § 541.1. N.J.S.A. 34:11-56a5 provides the Commissioner with the authority to promulgate regulations that are "appropriate to carry out the purposes" or "necessary to prevent the circumvention or evasion" of the MWL. See 29 U.S.C.A. § 213(a)(1) (authorization for FLSA regulations).
Although N.J.A.C. 12:56-7.1 has not been applied by a court of this State in a published decision,[4] we have guidance. N.J.A.C. 12:56-7.1 is modeled upon and in many instances identical to the FLSA regulation defining the "executive" exemption, 29 C.F.R. § 541.1.[5] Thus, we may rely upon judicial decisions construing the FLSA regulation and upon the interpretations of the FLSA regulation by the Secretary of the Department of Labor, which are published with the regulation in the Code of Federal Regulations. See State v. Chew, 150 N.J. 30, 695 A.2d 1301 (1997), cert. denied, 528 U.S. 1052, 120 S.Ct. 593, 145 L.Ed.2d 493 (1999).

III.
In order to invoke the "executive" exemption an employer must establish the employee's eligibility under six standards that, stated generally, relate to the following: compensation, managerial responsibility, authority to direct staff, authority to select and retain staff, authority to exercise discretion, and percentage of actual work devoted to management. N.J.A.C. 12:56-7.1. The purpose of this multifaceted test is to prevent invocation of the exemption by an employer who is using an "executive" title to avoid overtime obligations  a "strawboss" supervisor is not exempt. 29 C.F.R. § 541.115(b).
N.J.A.C. 12:56-7.1 provides:
(a) "Executive" means any employee:
1. Whose primary duty consists of the management of the enterprise in which he or she is employed or of a customarily recognized department or subdivision thereof; and
2. Who customarily and regularly directs the work of two or more other employees therein; and
3. Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion of any other change of status of other employees will be given particular weight; and
4. Who customarily and regularly exercises discretionary powers; and
5. Who devotes less than 20 percent of his or her workweek to non-exempt work or less than 40 percent if employed by a retail or service establishment, provided *380 that in either case he or she retains his or her role as manager and supervises two or more full time employees; and
6. Who is compensated for his or her services on a salary basis exclusive of gratuities, board, lodging or other facilities, at a rate of not less than $300.00 per week effective November 5, 1990, $350.00 per week effective April 1, 1991, and $400.00 per week effective April 1, 1992.
(b) "Executive" shall also include employees owning a bona fide equity in the enterprise of 20 percent or more.
(c) "Executive" shall not include employees training to become executives and not actually performing the duties of an executive.

IV.
We begin our discussion of the discrete requirements with subsection (a)6 because it establishes a straightforward threshold requirement based upon compensation. An employer must pay an employee $400 per week or more to claim an exemption based upon the employee's "executive" capacity. There is no question that FICC pays compensation that is adequate under this standard. The lowest salary for a general manager, exclusive of bonus, is $40,000 per year, $769 per week.
The remaining standards are not as easily understood or applied. We consider those standards in the order in which they appear in the regulation.
The focus of subsection (a)1 is on the adequacy of the employee's responsibility for management. N.J.A.C. 12:56-7.1(a)1. This subsection is identical to 29 C.F.R. § 541.1(a). It requires the employer to establish that the employee has management of a distinct unit as his or her "primary duty."
The purpose in requiring a distinct unit (in the terms of the regulation, "the enterprise. . . or of a customarily recognized department or subdivision" of the enterprise) is "to distinguish between a mere collection of [workers] assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 C.F.R. § 541.101. Subsection (a)1 prevents an employer from basing a claim of executive status on periodic or temporary assignment of managerial duties.
The evidence of FICC's eligibility with respect to distinct units is undisputed. Each restaurant has a separate location, payroll, deposit account, staff, budget and profitability rating. N.J.A.C. 12:56-7.1(a)1.
The Secretary of Labor identifies the following as management duties:
[I]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.
[29 C.F.R. § 541.102.]
FICC's training manuals, procedures and the testimony presented by both plaintiffs *381 and defendant establish that FICC's general managers have many of these "management duties." See Murray v. Stuckey's Inc., 939 F.2d 614, 619-20 (8th Cir.1991) (considering nationwide standards adopted by the employer), cert. denied, 502 U.S. 1073, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992); Cowan v. Treetop Enters. Inc., 120 F.Supp.2d 672, 691-92 (M.D.Tenn.1999) (manuals and training materials). They are responsible for interviewing, hiring, evaluating, disciplining, scheduling work hours, and assigning and reassigning staff. They plan for food preparation on a daily basis, order necessary supplies, implement procedures to prevent theft and waste, and analyze profit and loss statements. There is no question that they have management duties.
As is apparently often the case, the "more difficult question" is whether plaintiffs' managerial duties are "primary." For purposes of this regulation, "the meaning of `primary' is `principal' or `chief,' not `over one half.'" Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982) (Donovan I). The determination requires consideration of "all the relevant facts" and a qualitative assessment of the following: the employee's relative freedom from supervision; the frequency of the employee's exercise of discretion; the relative importance of managerial and non-managerial tasks; the time spent on managerial duties; and the employee's salary relative to the wages of workers supervised. See Donovan v. Burger King Corp., 675 F.2d 516, 520-21 (2d Cir.1982) (Donovan II); 29 C.F.R. § 541.103. No single factor is dispositive. See Donovan II, supra, 675 F.2d at 521.
FICC's evidence was adequate to support the trial court's conclusion that management is the plaintiffs' "primary duty" under this criteria. Each FICC general manager is "in charge" of the restaurant and operates it without any day-to-day supervision. Id. at 522. District managers appear on a discretionary and irregular basis. See Murray, supra, 939 F.2d at 619 (primary duty of a local store manager is no less managerial because of reporting to a regional manager whose primary duty is management of multiple stores at a higher level within the organization). District managers report on but do not control operations of the individual restaurants on a day-to-day basis.
The general managers regularly make discretionary decisions necessary to the day-to-day operation of the restaurant. The obligation to complete forms and follow FICC procedures channels but does not eliminate the general manager's exercise of discretion. See Donovan II, supra, 675 F.2d at 521-22. General managers must schedule employee hours, determine the quantities of food to order and prepare, select and correct employees, and move employees from one assignment to another as needs fluctuate throughout the day. These discretionary, managerial duties are performed on a regular basis throughout the day. 29 C.F.R. § 541.102; 29 C.F.R. § 541.107.
Plaintiffs' managerial duties are their "chief" duties in the sense that the managerial duties have greater importance to their role in the organization than does their performance of "fill-in" tasks when the demand for service is high or staff levels are low. They acknowledge that their obligation to supervise, correct, and discipline the restaurant workers is continual and a critical component of the job. Proper supervision is essential to the quality control and prevention of waste and theft that FICC requires. Cowan, supra, 120 F.Supp.2d at 691 (where training materials demonstrate that a manager's "critical" function is cooking, the exemption is not available).
*382 FICC trains and expects its general managers to step-in when there is a "bottleneck," and plaintiffs' testimony was that low staffing levels often require them to spend as much as eighty percent of their day lending a hand. The trial court did not credit that testimony. But, even if the trial court had found plaintiffs credible, relative allocation of time is only one factor that is not determinative of "primary" duty. See 29 C.F.R. § 541.103; see also Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1113, 1115-16 (9th Cir.2001) (managers of recreational vehicle park spent ninety percent of time on nonexempt duties); Murray, supra, 939 F.2d at 618-20 (manager of a Stuckey's, one of a chain of combination gasoline stations, convenience stores, and restaurants, claimed to spend sixty-five to ninety percent of time on non-managerial tasks); Kastor v. Sam's Wholesale Club, 131 F.Supp.2d 862, 866-67 (N.D.Tex.2001) (manager of bakery department spent ninety percent of his time performing non-managerial tasks).
The time plaintiffs spend cooking, serving food or clearing and wiping tables does not preclude simultaneous performance of their supervisory duties. Cooking, serving and clearing tables is not necessarily inconsistent with effective supervision. It can permit a general manager to teach techniques that improve performance and efficiency, monitor the portions and quality of food and review the accuracy of guest checks.
In analyzing the various duties and tasks of managers and assistant managers employed in Burger King restaurants, two federal Courts of Appeal have concluded that their duties are primarily managerial within the meaning of the federal regulation. Donovan II, supra, 675 F.2d at 520-22; Donovan I, supra, 672 F.2d at 225-27. The courts concluded, as we do, that non-exempt tasks such as cooking and serving permit and are not inconsistent with simultaneous supervision. Ibid.
Finally, the salary of FICC's general managers compares favorably with wages paid to other employees. An assistant manager working forty hours per week would earn less than $28,900. The minimum salary for a general manager is $40,000. The difference becomes more dramatic when the managers' salaries and the salaries of employees other than the assistant managers are compared. Servers earn under $3.00 per hour plus tips. See Moore v. Tractor Supply Co., 352 F.Supp.2d 1268, 1276-78 (S.D.Fla.2004) (noting that courts have not developed a particular measure and discussing cases), aff'd, No. 05-10189DC, 2005 WL 1625237 (11th Cir. July 12, 2005).
The trial court's conclusion that plaintiffs each have the primary duty of managing a "customarily recognized . . . subdivision" of the FICC under the qualitative, multi-factored standard incorporated in 29 C.F.R. § 541.1(a) and adopted in N.J.A.C. 12:56-7.1(a)1 is supported by this record.
The evidence also supports the conclusion that plaintiffs' supervisory obligations are sufficient to meet the requirements of subsection (a)2, which limits the "executive" exemption to employees who "customarily and regularly direct the work of two or more other employees." Plaintiffs direct the work of all employees of the restaurant and FICC's regulations require the presence of a minimum of three employees. See 29 C.F.R. § 541.1(b) (identical requirement).
FICC also established that its general managers have the authority to hire and fire required by subsection (a)3. See 29 C.F.R. § 541.1(c) (identical requirement). FICC's evidence demonstrated that plaintiffs hire, schedule work hours, evaluate, discipline and, at a minimum, make recommendations as to firing which are routinely *383 accepted if policies for progressive discipline have been followed. N.J.A.C. 12:56-7.1(a)3.
Plaintiffs also exercise sufficient discretion to meet the requirements of subsection (a)4, which limits the "executive" exemption (again in the words identical to those employed in the federal regulation) to employees who "customarily and regularly exercise[ ] discretionary powers." N.J.A.C. 12:56-7.1(a)4; 29 C.F.R. § 541.1(d). The preceding discussion of the general managers' "primary duty" includes an analysis of the general managers' duties that require daily and continuing exercise of discretion that is not eliminated by FICC's procedures and guidelines. There is no evidence that would permit the conclusion that plaintiffs lack the degree of discretion required by subsection (a)4.
A brief explanation of the relationship between subsection (a)1 and subsections (a)2-5 is necessary. On the facts of this case, it appears that subsections (a)2-4 require a duplication of discrete aspects of the analysis of "primary duty" under subsection (a)1. The Secretary's interpretations of the regulation explain the significance of the discrete standards in the course of discussing 29 C.F.R. § 541.1(c), which requires exercise of discretion. The purpose of the separate standard is to exclude "[a] person whose work is so completely routinized that he has no discretion" even if that factor was not sufficiently weighty to require exclusion under the multi-factored analysis of "primary duty." 29 C.F.R. § 541.107. Thus, the subsections that appear repetitive in this case have significance because no single factor is determinative under the test of subsection (a)1. The separate subsections serve to exclude employees who lack one of the essential components included in subsections (a)2, (a)3, and (a)4 even though the employees have management as their primary duty within the meaning of subsection (a)1.
Subsection (a)5 poses difficult questions of interpretation and application. It excludes a claim of executive status based upon time devoted to "non-exempt work." In the context of the restaurant business, a "service establishment," eligibility requires the employer to demonstrate that the manager "devotes" "less than forty percent" "of his or her workweek" "to non-exempt work." N.J.A.C. 12:56-7.1(a)5. Here, New Jersey's regulation deviates from the federal model, and we must consider the differences in language as reflecting an intention to depart from the federal standard. Airwork Serv. Div. v. Dir., Div. of Taxation, 2 N.J.Tax 329 (Tax 1981), aff'd o.b., 4 N.J.Tax 532 (App.Div.1982), aff'd, 97 N.J. 290, 294, 478 A.2d 729 (1984), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). The remedial purpose of the law requires us to construe the changes as an effort to exclude employees from the exemption and afford protection greater than the regulations implementing the FLSA. Where "the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced." Ramirez v. Yosemite Water Co., 20 Cal.4th 785, 85 Cal.Rptr.2d 844, 978 P.2d 2, 10 (1999).
We consider the differences to determine the purpose of the deviation. The comparable provision of the federal regulation has limited application; it is relevant only in cases involving employees who earn less than $250 per week. 29 C.F.R. § 541.1(e).[6] Under the FLSA, an employer *384 who pays at a rate of $250 per week or more may establish the employee's "executive" status under a less stringent "short test" that does include this quantitative analysis of tasks performed on a weekly basis: the "short test" does not require a determination of the percentage of the employee's workweek devoted to non-exempt work. See Donovan II, supra, 675 F.2d at 518-21; Donovan I, supra, 672 F.2d at 223-24. Where the "short test" applies, the employer need establish only three elements: the employee's compensation is fixed at $250 per week or more; the employee's "primary duty consists of the management of the enterprise . . . or of a customarily recognized department"; and involves "customary and regular direction of the work of two or more other employees.. . ." 29 C.F.R. § 541.1(f).[7]
Subsection (a)5 serves the same function as subsections (a)2, (a)3, and (a)4 discussed above. While relative time spent on managerial duties is one of several factors considered in determining "primary duty" under (a)1, under (a)5 time spent on non-exempt duties provides an independent basis for excluding an employee from the "executive" exemption solely on the basis of a quantitative review of time spent on non-exempt work.
The term "non-exempt work" is not defined in N.J.A.C. 12:56-7.1. Interpretative statements explaining this component of the federal "long test" use the terms "exempt" and "non-exempt" to describe the tasks that are counted in favor of and against "executive" status. See 29 C.F.R. § 541.112. The reasonable conclusion is that the intent here is to incorporate the descriptions included in the interpretative statements and simplify the language of the regulation. The phrasing of the federal standard is awkward, "work not directly and closely related to the performance of the work described in paragraphs (a) through (d)." Use of the terms exempt and non-exempt, made familiar by the Secretary's interpretations, serves as shorthand. On that basis, we conclude that non-exempt means work "not directly and closely related to qualifying managerial duties."
The interpretative statement explains: "Nonexempt work is easily identifiable where, as in the usual case, it consists of work of the same nature as that performed by the nonexempt subordinates of the `executive.'" 29 C.F.R. § 541.111(b). The primary purpose of the exclusionary language placing a limitation on the amount of non-exempt work is to distinguish between the bona fide executive and the `working' foreman or `working' supervisor who regularly performs . . . work which is unrelated or only remotely related to his supervisory activities." 29 C.F.R. *385 § 541.115(a). Thus, the explanation recognizes a distinction between a supervisor who does the same tasks side-by-side with the workers, and a supervisor who does the work to demonstrate or teach. Ibid. (using an example from the garment production industry). In that manner, it distinguishes "fill-in tasks," which are assigned because the supervisory and managerial duties do not take full time, from those tasks that are done in furtherance of the supervisory role. Another example distinguishes general record keeping from keeping records for performance evaluations. 29 C.F.R. § 541.115(b).[8]
The federal regulations were recently amended, and the amended regulations no longer require a time-percentage analysis of non-exempt activities for any employee. 29 C.F.R. § 541.1 (as amended effective Aug. 23, 2004). The Department of Labor explained that the requirement had fallen into disuse because of the outdated wage level that limited its application to low wage earners. See 69 Fed.Reg. 22122, 22126. The Department concluded that reactivation of the test, with its "moment-by-moment examination of an exempt employee's specific duties," would impose new monitoring requirements, recordkeeping burdens, and require employers to conduct a detailed analysis of the substance of each particular employee's daily and weekly tasks. Id. at 22126 to -27. Referencing judicial decisions that recognize an employee's ability to perform his or her primary duties while performing non-exempt tasks, and reporting complaints from department investigators and employers who found the distinction involved "a subjective and difficult evaluative task that prompted contentious disputes," the agency dispensed with the standard. See id. at 22127 (referencing Donovan I, supra). To date, no conforming amendments have been proposed in New Jersey.
The question we must confront is the proof an employer must adduce to establish eligibility under the percentage standard. The issue has not been expressly addressed in a federal decision disclosed by our review of the cases. In both Burger King cases discussed above, the Courts of Appeal affirmed the trial judge's factual determination that the employer had not established the percentage requirement for lower paid assistant managers "as not clearly erroneous," without discussion of proofs that would have sufficed. Donovan II, supra, 675 F.2d at 517; Donovan I, supra, 672 F.2d at 227. In other cases courts have found it unnecessary to reach the percentage requirement because of the employer's failure to establish "primary duty." See, e.g., Cowan, supra.
We cannot conclude that the Commissioner intended to require an employer to establish proof in the form of a moment-to-moment analysis of an employee's workweek. That interpretation would necessarily require detailed records of tasks performed at work, and the New Jersey regulations do not call for maintenance of such records. Cf. N.J.S.A. 34:56a20. The absence of a regulation requiring what would be needed suggests that there was no intention to demand proof of that sort to establish eligibility under subsection (a)5.
*386 Like New Jersey, California has a test based on a quantitative assessment of time spent on tasks. Ramirez, supra, 85 Cal.Rptr.2d 844, 978 P.2d at 10 & n. 4. The Supreme Court of California has described the questions and problems inherent in a "quantitative" review of exempt and non-exempt work as follows:
Is the number of hours worked . . . to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee should be working [on exempt work], or should it be determined by the actual average hours the employee spent on [such] activity? The logic inherent in the [regulation's] quantitative definition. . . dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on [exempt work] were determined through an employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in [exempt] activities during most of his working hours and falls below the. . . mark due to his own substandard performance [or affirmative choice] should not thereby be able to evade a valid exemption.
[Ramirez, supra, 85 Cal.Rptr.2d 844, 978 P.2d at 13.]
The Ramirez court directed a solution that allows trial courts to "steer clear of [the] two pitfalls" it identified. Ramirez, supra, 85 Cal.Rptr.2d 844, 978 P.2d at 13. The court held that a trial court should: "inquir[e] into the realistic requirements of the job," giving consideration to "how the employee actually spends his or her time," but also "consider[ing] whether the employee's practice diverges from the employer's realistic expectations. . . ." Ibid.
The approach adopted in Ramirez is properly protective of the employee without being unfair to the employer. The benefits of the Ramirez approach are particularly apparent in this case involving managers who schedule the hours of the non-exempt staff. On the one hand, there is a concern that the employer may provide an unreasonable labor budget which requires the managers to take on non-exempt work to succeed. On the other hand, there is a concern that the managers may schedule their staff time poorly, through inexperience, incompetence or design, thereby creating the necessity that justifies their own performance of non-exempt work and receipt of overtime pay.[9] By considering both the realistic basis for the employer's job description and the employees' fulfillment of the employer's reasonable expectations, the Ramirez test measures percentage of exempt and non-exempt work by a standard that is not only more practical but also more meaningful than a moment-to-moment analysis.
The trial court in this case took an approach that is consistent with the Ramirez standard, and we hold that it is the appropriate approach. The trial court reviewed the FICC's evidence about the responsibilities of its general managers, the testimony about the computer program that general managers are directed to use in order to determine the staffing levels, which is based upon the need for staff, and the plaintiffs' testimony that they spend only twenty percent of their time on exempt work. The trial court concluded:

*387 [If it] is, in fact, the case, [that plaintiffs spend only twenty percent of their time on managerial tasks] they are not performing their function as managers. Their testimony was to the effect that they had to clean-up parking lots, do the cooking, handle the fountain service and, at times, they had to wash dishes themselves. To believe this testimony [about the eighty percent time commitment] would mean that the plaintiffs failed to delegate responsibility.
Thus, the trial court reviewed the evidence of FICC's reasonable expectations, determined that FICC's staffing levels are realistic because they are based upon need, and considered plaintiffs' testimony about how they spend their time during the workweek. The court did not credit plaintiffs' testimony, and the court implicitly recognized that under the circumstances if the general managers were spending as much as eighty percent of their job on non-exempt work, then they were not meeting FICC's reasonable expectations.
We hold that FICC's evidence was adequate to meet the employer's burden to establish that its general managers are expected to devote less than forty percent of their workweek to non-exempt work and that the expectation is reasonable in light of the staffing permitted. N.J.A.C. 12:56-7.1(a)5. FICC established that the significant managerial responsibilities were sufficient to occupy the workweek. Proof of that sort negates any inference that non-exempt work is used as a prohibited "fill-in," as it is with "strawboss" supervisors. 29 C.F.R. § 541.115. FICC presented evidence that it employed computerized staffing models based upon criteria related to the demand for labor. That proof negates any inference that FICC either arbitrarily restricted staffing or did so in a bad faith effort to require its general managers to do non-exempt work for substandard pay. Cf. Donovan II, supra, 675 F.2d at 519 (because the evidence that employer's ideal ratio of staff to production was inconsistent with actual staffing and tolerated by the employer who had knowledge of the inadequacy, the trial judge's conclusion that Burger King failed to qualify its lower-paid, long test, assistant managers was not clearly erroneous).
We hold that an employer may establish compliance with N.J.A.C. 12:56-7.1(a)5 by evidence that demonstrates that: proper performance of expected managerial duties reasonably requires devotion of more than sixty percent of the employee's workweek; and the staffing levels in the unit are based on criteria adequate to meet the demands without assistance of the exempt managerial employees that takes more than forty percent of their time. Employees may rebut the evidence with proof of actual tasks performed. The ultimate burden of proof remains with the employer.
The decision of the trial court is supported by the evidence and consistent with controlling legal principles, and we defer to the judge's conclusions on the credibility of plaintiffs' rebuttal evidence. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974); Maggio v. Pruzansky, 222 N.J.Super. 567, 537 A.2d 756 (App.Div.1988). We affirm the order dismissing plaintiffs' complaint with prejudice.

V.
We also affirm the trial court's decision awarding counsel fees pursuant to Rule 4:58-1 and Rule 4:58-3. Abushawar raises only one narrow factual issue on this appeal, which does not have sufficient support in the record to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). He argues that he should not be required to pay the fees as directed because "the offer[s] of settlement were *388 contingent upon" acceptance of offers by all plaintiffs. That is the only argument he raises, and it is not supported by the record. The offer of judgment is included in FICC's appendix on this appeal. The offer was made to "plaintiff Ibrahim Abushawar." On its face, the offer of judgment is not contingent upon acceptance by any other plaintiff, and we decline to consider contradictory certifications about the plaintiffs' collective misunderstandings that were executed after the date of the trial judge's order.
The orders are affirmed.
NOTES
[1] The complaint included additional counts that are not at issue on this appeal. Plaintiffs also alleged breach of contract, breach of a covenant of good faith and fair dealing, fraud, deceit, and negligent misrepresentation. With the exception of the count alleging negligent misrepresentation, which plaintiffs dismissed voluntarily, the counts were dismissed with prejudice by agreement. Plaintiff Samer Abualouf also alleged wrongful termination, but he dismissed that count of the complaint.
[2] Plaintiffs James Morrissey and Ronald Marx do not appeal. Morrissey's claims were dismissed by the trial court with direction to arbitrate pursuant to a written agreement. Neither party has provided that order. After trial, Marx stipulated to dismissal of his claim with prejudice and without costs, and he has withdrawn his appeal.
[3] There is a preliminary issue relevant to our jurisdiction. The trial judge's order requiring Abushawar to pay fees and costs pursuant to R. 4:58-3 left open the amount to be paid, and, as a result, the orders were not appealable as of right when the notices of appeal were filed. See Kattoura v. Patel, 262 N.J.Super. 34, 40, 619 A.2d 1031 (App.Div.1993); McGowan v. Barry, 210 N.J.Super. 469, 472 n. 2, 510 A.2d 95 (App.Div.1986); R. 2:2-3(a)(1). Defendant's brief asserts that the fees and costs were set on September 8, 2004, but no order was provided. Because this appeal is fully briefed and FICC has not claimed prejudice, we grant leave to appeal nunc pro tunc and address the merits. R. 2:4-4(b)(2); R. 2:5-6(a); McGowan, supra.
[4] Two decisions of our trial courts address overtime claims under the FLSA, 29 U.S.C.A. §§ 201-219. Cf. Dimiro v. Township of Montclair, 290 N.J.Super. 708, 676 A.2d 627 (Law Div.1996) (federal law); Fox v. Armour & Co., 21 N.J. Misc. 262, 33 A.2d 582 (Dist.Ct.1943) (same).
[5] Amendments to 29 C.F.R. § 541.1, effective August 23, 2004, have substantially revised the federal regulation. See 69 Fed.Reg. 22260 (Apr. 23, 2004). As of August 16, 2005, the Commissioner of the Department of Labor has not proposed revisions to N.J.A.C. 12:56-7.1. Because the New Jersey regulation is modeled upon and informed by the regulations in effect prior to August 23, 2004, our references to the Code of Federal Regulations are to sections pertinent to the former regulation, except as otherwise noted.
[6] 29 C.F.R. § 541.1(e) provides:

(e) . . . [I]n the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: Provided, That this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed. . . .
[7] 29 C.F.R. § 541.1(f) provides:

(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week . . .: Provided, That an employee who is compensated on a salary basis at a rate of not less than $250 per week . . ., and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section.
[8] It is not surprising that the Secretary's illustrations do not include examples from the restaurant industry. The federal regulation's percentage requirement does not apply to "an employee who is in sole charge of an independent establishment or a physically separated branch establishment." 29 C.F.R. § 541.1(e). That exception to this component of the long test, which would encompass FICC's general managers, is not a component of N.J.A.C. 12:56-7.1(a)5.
[9] The complexity of the analysis most likely explains why the FLSA regulation never applied to an employee who is "in sole charge" of the unit he or she manages. Cf. 29 C.F.R. § 541.1(e). New Jersey's regulation does not include that exemption.