14 F.3d 1405
 1994 A.M.C. 1275, 127 Lab.Cas. P 10,979,
1 Wage & Hour Cas. 2d (BNA) 1381
 Rita FULLER, Babbette Thayer, Thomas Wilson, and the class
of similarly situated persons who have worked
aboard the F/T Michelle Irene,
Plaintiffs-Appellants,
v.
GOLDEN AGE FISHERIES, Simonson Enterprises V, Inc., Michelle
Irene Joint Venture, Westcod II, Inc., BTI IV,
Inc., et al., Defendants-Appellees.
 No. 92-35330.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 3, 1993.
Decided Jan. 24, 1994.
 
 Bradley H. Bagshaw, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, WA, for plaintiffs-appellants.
 Lynne M. Cohee, Hillis Clark Martin & Peterson, Seattle, WA, for defendants-appellees Golden Age Fisheries, et al.
 James D. Rolfe, Graham & Dunn, Seattle, WA for defendants-appellees Michelle Irene Joint Venture, et al.
 Appeal from the United States District Court for the Western District of Washington.
 Before: WRIGHT, GOODWIN and HUG, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Rita Fuller, Babbette Thayer, and Thomas Wilson ("plaintiffs") appeal a summary judgment for Golden Age Fisheries, Inc., et al. ("defendants") in plaintiffs' action for unpaid wages as crewmembers on several Alaskan fishing voyages.
 
 
 2
 The district court held that the plaintiffs' in rem claims against the vessel were time-barred under 46 U.S.C. Sec. 10602(a). The court also held that plaintiffs' in personam wage claims were time-barred under a provision in their employment contracts. Finally, the court held that federal law preempted plaintiffs' minimum wage and overtime claims under Alaska state law. The district court had jurisdiction under 28 U.S.C. Sec. 1333. We have jurisdiction under 28 U.S.C. Sec. 1291, and affirm.
 
 
 3
 Plaintiffs worked aboard the defendant vessel, F/T PACIFIC ORION, formerly the MICHELLE IRENE (the "MICHELLE IRENE"), at times during the period from September 23, 1989, through November 21, 1990. They brought this action on behalf of approximately 300 seamen and women who were employed as processors and crewmembers and who dispute the division of proceeds from the sale of fish.
 
 
 4
 The MICHELLE IRENE, a factory trawler whose home port is Seattle, is engaged in the catching and processing of fish at sea. Golden Age Fisheries managed the vessel. The vessel fished off the coast of Alaska during the period covered by this action. Neither fishing nor processing was conducted within three miles of the shoreline of Alaska. The time in port while unloading fish and loading supplies was usually two to three days; trips at sea were typically two to three weeks.
 
 
 5
 The processed fish was typically unloaded in Dutch Harbor, Alaska, onto a Japanese tramper. The bulk of the product was then shipped to Japan, where it was sold by a commission sales broker. A portion of the catch was sold in the United States. All of the catch harvested between September 23, 1989 and November 21, 1990, was sold by January 31, 1991.
 
 
 6
 Plaintiffs signed written employment contracts that said they would be paid "crewshares" based on a percentage of the estimated fair market value of the catch. Each contract contained a six-month requirement for asserting claims against the vessel owners.[1] The contract had a choice of law provision that selected Washington as the governing law.
 
 
 7
 Plaintiffs brought this action on October 6, 1991. They allege that defendants underestimated the value of the fish, thereby reducing the value of their crewshares and breaching the wage terms of the contract. They also allege that defendants failed to distribute to the crew its agreed percentage of that allegedly underestimated value. Finally, they contend that defendants failed to pay them the minimum wage required under Alaska law.
 
 
 8
 We review a grant of summary judgment de novo. Jones v. Union Pacific R.R., 968 F.2d 937, 940 (9th Cir.1992).
 
 ANALYSIS
 1. Applicability of 46 U.S.C. Sec. 10602
 
 9
 Fishing vessels and fish processing vessels weighing at least twenty tons and voyaging from a United States port must enter into a written fishing agreement with each seaman employed on board the vessel. 46 U.S.C. Sec. 10601(a). Each agreement must be signed by the vessel's owner and must include certain delineated terms of the seaman's employment. Id. Sec. 10601(b) and (c).
 
 
 10
 Section 10602(a) provides for an in rem action against the vessel for unpaid wages. This section allows the seaman to place a lien on the vessel to recover a share of the ship's proceeds. The section reads:
 
 
 11
 When fish caught under an agreement under section 10601 of this title are delivered to the owner of the vessel for processing and are sold, the vessel is liable in rem for the wages and shares of the proceeds of the seaman. An action under this section must be brought within six months after the sale of the fish. (emphasis added)
 
 
 12
 The plaintiffs do not dispute that the six-month limitation period had already run when they filed this suit.[2] Instead, they argue that Congress never intended Sec. 10602 to limit the ancient right of fishermen under general maritime law to place a lien on the vessel as security for wages. Citing the history of the section, they contend that Sec. 10602 merely provides a cumulative in rem remedy for cod and mackerel fishermen.[3]
 
 
 13
 To support their argument, plaintiffs cite the savings clause in Sec. 10602(c), which reads: "This section does not affect a common law right of a seaman to bring an action to recover the seaman's share of the fish or proceeds." The district court concluded that the savings clause merely preserves a seaman's common law right to bring an action for wages when there is no written agreement under Sec. 10601. An alternative reading is that the savings clause preserves a seaman's right to proceed in personam against the vessel's owners for breach of a written or oral fishing agreement.
 
 
 14
 We need not decide the preferred reading of the savings clause because the plaintiffs' argument fails under either reading. Their argument would undermine 46 U.S.C. Sec. 10601 et seq. altogether. They have cited no congressional history to support their limited view of the statute, and a plain reading of the language does not support their position. When congressional legislation directly addresses a question, that legislation preempts existing federal common law. Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978).
 
 
 15
 Thus, we affirm the district court's holding that Sec. 10602 applies. Because the plaintiffs did not file their in rem claim within the six-month period, it is barred.[4]
 
 2. Contractual Time Limitation
 
 16
 We next consider whether the trial court erred by enforcing a time-limitation provision in plaintiffs' employment contracts. The provision required them to assert any claims over their wages within six months after the voyage ended.
 
 
 17
 Plaintiffs contend that seamen's wage claims historically have been governed by the equitable doctrine of laches. They argue that by signing contracts with a six-month claim limitation, they severely restricted their rights. They contend that this waiver of rights was neither knowing nor intelligent, and was both unfair and unreasonable.
 
 
 18
 Plaintiffs argue that courts must closely scrutinize contracts limiting the rights of seamen. They rely on a long line of cases that describe seamen as "wards of the court" needing special protections from potentially overreaching ship owners. See Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239 (1942); Harris v. Pennsylvania R. Co., 50 F.2d 866, 868 (4th Cir.1931); Harden v. Gordon, 11 F.Cas. 480, 485 (C.C.D.Me.1823) (No. 6,047).
 
 
 19
 The Fifth Circuit recently relied on the doctrine providing special protection for seamen in Castillo v. Spiliada Maritime Corp., 937 F.2d 240 (5th Cir.1991). In Castillo, the court said:
 
 
 20
 Historically, seamen have enjoyed a special status in our judicial system. They enjoy this status because they occupy a unique position. A seaman isolated on a ship on the high seas is often vulnerable to the exploitation of his employer. Moreover, there exists a great inequality of bargaining position between large shipowners and unsophisticated seamen. Shipowners generally control the availability and the terms of employment.
 
 
 21
 Id. at 243. We have no quarrel with the traditional view admiralty courts employ in reading articles of employment.
 
 
 22
 Whoever drafts a limitation of rights must prove that it "was executed freely, without deception or coercion, [ ] that it was made by the seaman with full understanding of his rights" and that it is fair to the seaman. Garrett, 317 U.S. at 248, 63 S.Ct. at 252.
 
 
 23
 While the district court expressed some reservation about whether the special scrutiny for seamen's contracts was necessary in this case, it nevertheless found that the plaintiffs had sufficient education and experience to read and understand the contracts they signed and were given adequate opportunity to review and discuss their contracts prior to signing them.[5] There was no evidence of overreaching. Even if the evidence is viewed in the light most favorable to the nonmoving party, the plaintiffs failed to present a genuine issue of material fact about whether the signing of the contracts involved fraud or coercion.
 
 
 24
 The limitations period also was not unfair or unreasonable. Congress thought six months was reasonable when it passed Sec. 10602, which sets forth a similar time limitation on bringing in rem claims. Thus, the ruling that the plaintiffs' in personam claims were time-barred was proper.
 
 3. Alaska Minimum Wage Claims
 
 25
 Plaintiffs next contend that the district court erred in finding that federal law precluded their claims under the Alaska minimum wage and overtime statute.
 
 
 26
 The Fair Labor Standards Act ("FLSA") provides an exemption from the Act's wage and overtime provisions for fishermen. It exempts persons employed in "catching ... any kind of fish ... or in the first processing [of the catch] at sea ... in conjunction with ... fishing operations." 29 U.S.C. Sec. 213(a)(5). It also exempts "seamen" from the federal overtime provisions in FLSA. Id. Sec. 213(b)(6).
 
 
 27
 Despite these express exemptions, plaintiffs contend that the Ninth Circuit's decision in Pacific Merchant Shipping Ass'n v. Aubry, 918 F.2d 1409 (9th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 2956, 119 L.Ed.2d 578 (1992), compels us to rule that the FLSA does not preempt their wage and overtime claims.
 
 
 28
 In Aubry, we held that Sec. 213(b)(6) does not preempt California from applying the state's overtime pay laws to certain maritime employees. Id. at 1417. We balanced the state and federal interests involved, and said that "states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not actually conflict with federal law or interfere with the uniform working of the maritime legal system." Id. at 1422 (emphasis in original).
 
 
 29
 We concluded that because the plaintiffs were residents of California who did not engage in "foreign, intercoastal, or coastwise voyages," application of the California labor statutes would not interfere with uniform application of federal admiralty law. Id. at 1426-27. Also key to our decision was the fact that the state of California had a "strong interest in protecting maritime employees that reside in the state and [who] work to protect California's coastal environment" through oil spill clean-up operations. Id.
 
 
 30
 Aubry is distinguishable from this case because it does not apply to coastwise voyages and turns on significant state interests not present in this case. Unlike the crewmembers in Aubry, plaintiffs here were engaged in coastwise voyages and their predominant job situs was the high seas rather than the territorial waters of Alaska.[6]
 
 
 31
 Also important is the fact that plaintiffs here were not Alaska residents, unlike the California resident fishermen in Aubry. Here, the fishermen were generally hired and began their employment in Seattle, and at the conclusion of their employment, were typically flown back to Seattle. Their contact with Alaska was minimal compared to the extensive contact the Aubry plaintiffs had with the state of California.
 
 
 32
 Finally, with regard to state interests, defendants submitted a letter from the Alaska Department of Labor indicating that it does not generally exercise jurisdiction over factory trawlers when the employees are primarily hired to work outside of Alaska's borders and the work performed within the state's jurisdictional boundaries is only incidental. The district court correctly concluded that federal law preempts plaintiffs' Alaska state wage and overtime claims.
 
 
 33
 For all of the foregoing reasons, the district court's judgment is AFFIRMED.
 
 
 
 [1]
 Two different versions of the limitations provision were used during the period at issue. One form of the contract said: "The Crewmember agrees that any legal actions taken by him/her in connection with this Contract shall be brought within six (6) months after the date of the action or shall thereafter be waived. Parties waive any and all rights to attorneys fees."
 The other version stated: "Any claim for money arising out of this agreement or employment relationship between crewmember and owner shall be made in writing within six (6) months after this agreement is completed or terminated; otherwise, such claim shall be waived."
 
 
 [2]
 All of the fish caught during the relevant time period was sold by January 31, 1991. Plaintiffs' complaint was not filed until October 16, 1991, eight and one-half months later
 
 
 [3]
 Plaintiffs claim that the predecessor of Sec. 10602 was restricted to the cod and mackerel fisheries and was designed to ensure that fishermen got their share of salt allowances or bounties that the federal government paid to those engaged in such fisheries. See 46 U.S.C. Sec. 533 (repealed by Commercial Fishing Vessel Safety Act of 1988, P.L. 100-424, Sec. 6(c), 102 Stat. 1592 (Sept. 9, 1988)). They claim that during the 1988 revision of the statute, no representative or senator mentioned the purported changes in the scope of the section. They argue this lack of discussion belies any inference that Congress intended to make a major change in the law of seaman's wage claim remedies
 
 
 [4]
 Plaintiffs also argue that they are outside the reach of the statute because Sec. 10602 applies only in cases when the "fish ... are delivered to the owner of the vessel for processing and are sold." They contend that the statute does not apply to factory trawlers, such as the MICHELLE IRENE, where the processing was done on board the ship. This argument is without merit. First, Sec. 10601(a) specifically applies to "fish processing vessel[s]." Second, because the owners of the MICHELLE IRENE own the boat as well as its fish processing equipment, the fish were delivered to the owners for processing
 
 
 [5]
 Both Fuller and Wilson were among the 246 class members in another class action against most of the same defendants, alleging similar fraudulent pay practices. See Adamek v. Golden Age, No. C89-1463R (W.D.Wash.1989). When the Adamek case settled in 1991, the defendants paid the plaintiff class approximately $510,000, plus attorneys fees. Thayer admitted in deposition testimony that she was aware of the litigation dispute at the time she signed her contract with Golden Age Fisheries
 
 
 [6]
 The plaintiffs contend that coastwise voyages are not involved here because the MICHELLE IRENE left Dutch Harbor, Alaska, fished, and returned to Dutch Harbor. "It did not travel up and down the coast." However, the MICHELLE IRENE's home port was Seattle; the voyage to Alaska included international waters; and much of the fishing was on the high seas