129 A.3d 1129

HOWARD E. FLECKER, III, ON BEHALF OF HIMSELF AND ALL OTHER SIMILARLY SITUATED PERSONS, PLAINTIFF, v. STATUE CRUISES, LLC, AND TERRY MACRAE, DEFENDANTS.

Superior Court of New Jersey
Law Division Hudson County

Decided June 13, 2013.

*Ravi Sattiraju* for plaintiffs (*The Sattiraju Law Firm, P.C.,* attorneys).

*Raymond G. McGuire* (*Kauff, McGuire & Margolis* ) of the New York bar, admitted pro hac vice, for defendants (*Genova, Burns & Giantomasi* ), and *Mr. McGuire,* attorneys; *Patrick W.*

*McGovern* and *Mr. McGuire,* of counsel; *Aislinn S. McGuire* (*Kauff, McGuire & Margolis* ) of the New York bar, admitted pro hac vice.

LAWRENCE MARON, J.S.C.

This matter comes before the Court on remand from the Appellate Division. In *Flecker v. Statue Cruises, LLC,* No. A–4390–10 (App.Div. Nov. 14, 2012) (slip op. at 2), 2012 *WL* 5499894, the Appellate Division instructed this court to "make specific factual findings that include a determination to what extent, if any, [defendants'] operation[ ] extend[s] into federal waters, and if so, whether application of New Jersey's Wage and Hour Law would prove so disruptive that federal law should preempt New Jersey law, as well the nature and scope of Statue's operations in New Jersey and New York."

In addition, this court granted defendants' request to re-brief the issue of whether plaintiff's Conscientious Employee Protection Act ("CEPA") claim is preempted by the National Labor Relations Act ("NLRA").

This Court entertained oral argument on April 24, 2013, and May 10, 2013.

*Relevant Factual Background and Procedural History*

For the sake of expediency, this court adopts the facts and procedural history set forth in detail by the Appellate Division. However, for purposes of addressing the specific issues before this court, the pertinent facts are as follows:

Plaintiff, Howard E. Flecker ("plaintiff"), was employed as a deckhand by Statue Cruises, LLC ("defendants" or "Statue Cruises"), which provides passenger ferry service from ports in New York and New Jersey to Liberty Island and Ellis Island. Plaintiff was a member of a collective bargaining unit, comprised of forty to forty-five employees, whose employment contract with Statue Cruises called for them to be paid for overtime at a rate of time

and one-half of the employee's straight time for hours worked in excess of forty-eight hours per week.

On September 10, 2009, plaintiff filed a single-count class action complaint alleging that the Collective Bargaining Agreement ("CBA") was contrary to the New Jersey Wage and Hour Law ("NJWHL"). After filing the complaint, a Statue Cruises executive, Michael Burke, authored an October 1, 2009, memorandum informing employees about the lawsuit. The memo identified plaintiff as a named party in the lawsuit and advised employees that in an effort to mitigate damages, Statue Cruises would no longer schedule union employees to work more than forty hours per week until the issues raised in the complaint were resolved. The memo further stated:

> We have been informed, and have reason to believe, that this lawsuit (which is brought by Howard Flecker III, the brother of an official in Local 333) may be supported by your collective bargaining representative, Local 333. If that is the case, we are puzzled and disappointed that the Union apparently did not consider the impact the lawsuit would likely have on you and our Company. For those of you who will lose a day's pay (or more) every week, I leave it to your good judgment whether Local 333's possible involvement in this lawsuit was in your best interests.

Following the issuance of the October 1, 2009, memo, plaintiff claims his hours were reduced from forty to fifty hours per week to approximately thirty-five hours per week.

On cross-summary judgment motions, one filed by plaintiff and one filed by defendants, the trial court that originally heard this matter denied plaintiff's motion and granted defendants' cross-motion. Relevant to the issues before this Court, the original trial court concluded that plaintiff's wage and hour claim was preempted by federal law. The trial court stated:

> Here, under New Jersey law, there is not an exemption from the Wage and Hour laws with respect to seamen. New York, like the [FLSA], has a specific provision in its law that would exempt them.

> Under the analysis employed in *Strain [v. W. Travel, Inc.* 117 *Wash.App.* 251, 70 *P.*3d 158 (2003), *review denied,* 150 *Wash.*2d 1029 82 *P.*3d 243 (2004) ], *Coil [v. Jack Tanner Towing Co.,* 242 *F.Supp.*2d 555 (S.D.Ill.2002) ], and *Fuller [v. Golden Age Fisheries,* 14 *F.*3d 1405 (9th Cir.), *cert. denied,* 512 *U.S.* 1206, 114 *S.Ct.* 2677, 129 *L.Ed.*2d 812 (1994) ], the New Jersey Wage and Hour law should not apply.

*Analysis*

## I. *Preemption by Federal Law*

■ "Article III, § 2 of the United States Constitution, extends judicial power 'to all cases of admiralty and maritime jurisdiction.'" *Coil v. Jack Tanner Co., Inc.*, 242 *F.Supp.*2d 555, 558 (S.D.Ill.2002). "Additionally, state and federal courts have recognized, through well-settled law, that it is the intention of the Constitution and Congress for federal law to control *all* maritime law." *Id.* (citing *Knickerbocker Ice Co. v. Stewart*, 253 *U.S.* 149, 40 *S.Ct.* 438, 64 *L.Ed.* 834 (1920); *S. Pac. Co. v. Jensen*, 244 *U.S.* 205, 37 *S.Ct.* 524, 61 *L.Ed.* 1086 (1917) (superseded by statute)). "The Constitution makes clear that 'Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country.'" *Id.* (citing *Jensen, supra,* 244 *U.S.* at 215, 37 *S.Ct.* at 528, 61 *L.Ed.* at 1098). The primary purpose of federal admiralty jurisdiction is to "protect[ ] commercial shipping" with "uniform rules of conduct." *Sisson v. Ruby,* 497 *U.S.* 358, 362, 110 *S.Ct.* 2892, 111 *L.Ed.*2d 292 (1990); *see also Foremost Ins. Co. v. Richardson,* 457 *U.S.* 668, 674–75, 102 *S.Ct.* 2654, 2658, 73 *L.Ed.*2d 300, 305 (1982) (Although protecting commercial shipping is at the heart of admiralty jurisdiction, this test applies with equal force to pleasure and business maritime navigation).

Furthermore, in *Coil,* the court determined that "state law will yield to federal maritime law where a state remedy 'works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations.'" *Coil, supra,* 242 *F.Supp.*2d at 559 (citations omitted).

■ Federal law preempts state law where: "(1) Congress expressly preempts state law; (2) Congress has established a comprehensive regulatory scheme in the area effectively removing the entire field from the state realm; or (3) state law directly conflicts with federal law or interferes with the achievement of

federal objectives." *Pac. Merch. Shipping Ass'n v. Aubry*, 918 *F.*2d 1409, 1415 (9th Cir.1990).

Federal law providing for a minimum wage and overtime pay is contained in the Fair Labor Standards Act of 1938 ("FLSA" or "Act"), 29 *U.S.C.A.* §§ 201 to –219. As to overtime wages, the FLSA requires employers engaged in "commerce" to pay employees wages "at a rate not less than one and one-half times the regular rate" for hours worked in excess of forty hours per week. *See* 29 *U.S.C.A.* § 207(a)(2). Similarly, under New Jersey law, employers are required to pay their employees overtime in an amount equivalent to "1 ½ times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week[.]" *N.J.S.A.* 34:11–56a4.

However, the FLSA specifically exempts from its overtime wage requirements "any employee employed as a seaman." *See* 29 *U.S.C.A.* § 213(b)(6). The United States Department of Labor ("USDOL") regulations define a "seaman" under the FLSA as a person who works "primarily as an aid in the operation of [a] vessel as a means of transportation, provided he performs no substantial amount of work of a different character." *See* 29 *C.F.R.* § 783.31 (2008).

In the instant matter, the plaintiff does not dispute the fact that he is a seaman. *See Flecker, supra,* (slip op. at 27). (The Appellate Division noted that "[p]laintiff ... does not appear to contest the court's determination that he is, in fact, a seaman under the FLSA.")

Generally, the FLSA does not prevent states from enacting their own overtime wage provisions. The Act contains a "savings clause" which expressly permits states to establish a lower maximum workweek:

> No provision of this Act or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this Act or a maximum workweek lower than the maximum workweek established under this Act.
>
> [29 *U.S.C.A.* § 218(a).]

By contrast, the New Jersey Wage and Hour Law ("NJWHL") does not exempt seamen from its overtime provision.

### a. To What Extent Do Defendants' Operations Extend Into Federal Waters?

Prior to determining whether application of the NJWHL would prove so disruptive that federal law should preempt New Jersey law, this court must first make specific factual findings as to what extent, if any, Statute's operations extend into federal waters.

Plaintiff contends that defendants' vessels never enter the high seas/federal waters. In support of this position, plaintiff relies upon the Ninth Circuit's definition of "territorial" and "high" seas in *Aubry*, and *New Jersey v. New York*, 523 *U.S.* 767, 118 *S.Ct.* 1726, 140 *L.Ed.*2d 993 (1998). In *Aubry*, cited to and analyzed in the briefs submitted by both parties, the Ninth Circuit stated that "[t]he 'territorial sea' is the sea from shore to three nautical miles off shore," and "[t]he 'high seas' are ocean waters outside the territorial sea, i.e., more than three miles offshore." *Aubry, supra*, 918 *F.*2d at 1412. In *New Jersey v. New York*, the United States Supreme Court noted that the boundaries of New York's and New Jersey's waters meet in the middle of the Hudson River/New York Harbor. *New Jersey v. New York, supra*, 523 *U.S.* at 767, 118 *S.Ct.* at 1732, 140 *L.Ed.*2d at 1007.

Plaintiff also provided the Court with a large scale copy of Rand McNally's 2013 Large Scale Road Atlas to demonstrate that the official border of the State of New Jersey extends to the waterways bordering its shorelines and that the water boundary between New York and New Jersey meets directly in the middle of the Hudson River. Thus, based on plaintiff's reading of the map, Statue Cruises's vessels travel only in New York and New Jersey territorial waters, not federal waters.

In opposition, defendants assert that the "[u]pper New York Bay, giving access as it does to the Atlantic Ocean, the Hudson River, the Erie Canal, the Great Lakes and the St. Lawrence

Seaway, is clearly a federal navigable waterway, undisputedly 'subject to the jurisdiction of the United States' and is water 'over which the United States has jurisdiction.'" *See, e.g.,* 33 *C.F.R.* § 2.38(a); 33 *C.F.R.* § 2.36(a); *LeBlanc v. Cleveland,* 198 *F.*3d 353, 359 (2d Cir.1999) (for the purposes of federal admiralty jurisdiction, "a waterway . . . is navigable for jurisdictional purposes if it is presently used, or is presently capable of being used, as an interstate highway for commercial trade or travel in the customary modes of travel on water.")

In his response, plaintiff emphasizes that he "does not dispute what the United States Constitution says, nor does he dispute that, under the Constitution, navigable waters are subject to federal regulation." In fact, plaintiff states that "the Hudson River and New York Harbor, are indeed subject to federal law by way of the FLSA and various other statutes." Rather, plaintiff argues that state regulation of employees is permitted in this instance and that the FLSA explicitly permits application of the NJWHL in matters such as this through the savings clause.

■ The admiralty and maritime jurisdiction granted to the federal government by the United States Constitution is not limited to tidewaters, but extends to all public navigable lakes and rivers, where commerce is carried on between different states, or with a foreign nation. *The Propeller Genesee Chief v. Fitzhugh,* 53 *U.S.* (12 *How.*) 443, 453, 13 *L.Ed.* 1058, 1063 (1851). Furthermore, it is undisputed that the Hudson River is a navigable body of water that is subject to federal admiralty and maritime jurisdiction as it is used for interstate commerce and empties into the Atlantic Ocean. *See The Propeller Commerce,* 66 *U.S.* (1 *Black*) 574, 579, 17 *L.Ed.* 107, 109 (1861) (civil causes of admiralty and maritime jurisdiction apply to the navigable waters of the Hudson and all other navigable waters of the Atlantic coast which empty into the sea, or into the bays and gulfs that form part of the sea). This is further highlighted by the fact that the boundaries of two states meet directly in the middle of the Hudson River, thereby clearly establishing the defendants' operation of its vessels within

the contours of interstate commerce. *See New Jersey, supra,* 523 *U.S.* at 770–773, 118 *S.Ct.* at 1732, 140 *L.Ed.*2d at 1007.

The defendants assert that that the United States Supreme Court in *New Jersey v. New York* did not find that the boundaries of each state's waters meet in the middle of the Hudson River. Instead, the Supreme Court held that all waters in the Hudson River up to the low water mark of New Jersey's shoreline, are New York waters and only the land under the water is bifurcated. *See New Jersey, supra,* 523 *U.S.* at 770–773, 118 *S.Ct.* at 1732, 140 *L.Ed.*2d at 1007.

The Court finds that the actual boundary between New Jersey and New York is not relevant to the matter in question. Instead, what the Court does find materially relevant is the fact that "[t]he terms of the [C]ongressional consent to the Compact close with the provision that 'nothing therein contained shall be construed to impair, or in any manner affect, any right of jurisdiction of the United States in and over the islands or waters which form the subject of the said agreement.' " *New Jersey, supra,* 523 *U.S.* at 770–773, 118 *S.Ct.* at 1732, 140 *L.Ed.*2d at 1007.

Based on the foregoing, this court finds that the Hudson River, as a navigable body of water is federal waters, as defined by the Supreme Court in *The Commerce* and by the Second Circuit in *LeBlanc.* *See The Commerce, supra,* 66 *U.S.* at 579, 17 *L.Ed.* at 109 (admiralty and maritime jurisdiction apply to the navigable waters of the Hudson); *LeBlanc, supra,* 198 *F.*3d at 359 (for the purposes of federal admiralty jurisdiction, "a waterway . . . is navigable for jurisdictional purposes if it is presently used, or is presently capable of being used, as an interstate highway for commercial trade or travel in the customary modes of travel on water").

### b. Whether Application of New Jersey's Wage and Hour Law Would Prove So Disruptive That Federal Law Should Preempt New Jersey Law?

After first finding that Statue Cruises's operations extend into federal waters, the court next needs to determine whether

application of the NJWHL would prove so disruptive that federal law should preempt New Jersey law.

First, the court notes, as did the Appellate Division, that this is a case of first impression under New Jersey law, as no reported New Jersey decision has addressed the issue of whether federal admiralty and general maritime law preempt the application of NJWHL to seamen. *Flecker, supra,* slip op. at 9.

However, courts in other jurisdictions have directly addressed the issue before this court, albeit with inconsistent results. The Ninth Circuit in *Aubry* held that § 213(b)(6) does not preempt California from applying the state's overtime pay laws to certain maritime employees. *Aubry, supra,* 918 *F.*2d at 1417. The Ninth Circuit balanced the state and federal interests involved, and said that "states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system." *Id.* at 1422. The Ninth Circuit concluded that because the plaintiffs were residents of California, who did not engage in "foreign, intercoastal, or coastwise voyages," application of the California labor statutes would not interfere with uniform application of federal admiralty law. *Id.* at 1426–27. Also key to the Ninth Circuit's decision was the fact that the state of California had a "strong interest in protecting maritime employees that reside in the state and [who] work to protect California's coastal environment" through oil spill clean-up operations. *Id.* at 1426.

However, as noted previously, opposite conclusions were reached in both *Coil, supra,* 242 *F.Supp.*2d at 555, and *Strain v. West Travel, Inc.,* 117 *Wash.App.* 251, 70 *P.*3d 158 (2003). In *Coil,* which also involved the issue of whether a state's (Illinois) minimum wage law applied to a seaman on the navigable waterways (Mississippi River and Illinois waters), the district court held that state laws yield to federal maritime law when a state remedy works material prejudice to the general maritime law and that state's overtime law may not be applied without entering a realm

in which Congress has taken specific action. *Coil, supra,* 242 *F.Supp.*2d at 555. In reaching its conclusion, the court found that "the application of Illinois or any state's differing overtime provisions to seamen on federal waters would destroy the uniformity of rules applicable to commerce on the inland waterways." *Id.* at 559. In distinguishing its facts from *Aubry,* the court highlighted the fact that *Coil* involved interstate commerce, the selling and delivery of goods between states, and the varying state presence of Illinois and Missouri, and of the Mississippi River channel. *Id.* at 560–561.

Likewise, in *Strain,* the dispute centered upon "whether [applying the] Washington [Minimum Wage Act] to employees on cruise ships making interstate voyages would unduly disrupt harmony and uniformity in the federal admiralty system." *Strain, supra,* 70 *P.*3d at 162. The court continued, stating:

> The itinerary Strain worked, for example, began in Oregon, included stops in Washington and Oregon, and ended in Portland. Oregon and Washington have differing minimum wage rates. Further, the potential class members are residents of many different states. Under *Strain's* analysis, Cruise West would presumably pay each worker according to the laws of the worker's home state—a nightmarish accounting prospect. The potential disruption of the uniformity and harmony of the maritime law is clear.
>
> [*Id.* at 162–63.]

In light of that, the court concluded that the potential disruption of the uniformity and harmony of the maritime law is clear and that while Washington undoubtedly has a strong interest in ensuring its residents are paid a fair wage, that interest is protected by the federal minimum wage law. *Id.* at 163.

Plaintiff relies upon the Ninth Circuit's decision in *Aubry,* and asserts that established precedent permits application of the NJWHL to his claim as it does not disrupt or conflict with the FLSA in any way. In addition, plaintiff contends that the Ninth Circuit's analysis in *Aubry,* which centered upon whether Congress had a "clear and manifest intent" to expressly prohibit states from applying their overtime laws to seamen, is the correct and proper analysis to apply to the facts in the instant matter.

Further, plaintiff cites to cases that have found the FLSA to have not preempted a state's wage and hour laws. *See, e.g., State v. Comfort Cab, Inc.,* 118 *N.J.Super.* 162, 286 *A.*2d 742 (Law Div.1972). In *Comfort Cab,* one of the first New Jersey cases to consider the relationship between the FLSA and the NJWHL, the court observed that both enactments were intended to be "humanitarian and remedial," and that, generally, where a conflict exists between state and federal law, the scheme "creating an overtime arrangement more favorable to the employee ... should prevail." *Id.* at 168, 286 *A.*2d 742. *See also Marx v. Friendly Ice Cream Corp.,* 380 *N.J.Super.* 302, 309–310, 882 *A.*2d 374 (App.Div.2005) (the FLSA does not preclude states from extending its protection to a greater number of employees by narrowing the group of employees excluded from the law); *Pettis Moving Co. v. Roberts,* 784 *F.*2d 439, 441 (2d Cir.1986) ("Congress did not prevent the states from regulating overtime wages paid to workers exempt from the FLSA. [Section 18(a) ] explicitly permits states to set more stringent overtime provisions than the FLSA").

In response, defendants note that the basis for preemption that they advance is primarily on the dictates of federal admiralty law and not the FLSA, and the well-established federal interest in uniformity with respect to all admiralty and maritime cases. Moreover, defendants contend that the true issue in this matter is that the interests of two states overlap or conflict. Thus, in this context, general federal admiralty law, which is specifically intended to govern controversies where more than one state's interests are implicated in maritime matters, must be applied. *See Jensen, supra,* 244 *U.S.* at 215, 37 *S.Ct.* at 529, 61 *L.Ed.* at 1098. Additionally, defendants rely upon the holdings of both *Strain* and *Coil* and contend that applying New Jersey's law would disrupt the proper harmony and uniformity of existing admiralty law. Specifically, Statue Cruises "would have to track every employee's location at every minute of each voyage, noting each time they dock, however briefly, in New Jersey territory in order to determine how much time the employee worked in New Jersey and how

much in New York, creating precisely the 'nightmarish accounting prospect' the court in *Strain* found to be untenable."

Defendants provide a statistical breakdown of the amount of time an employee spends in each state's respective territory. During peak season—Memorial Day to Labor Day—boats originating from Battery Park, New York, spend approximately 87.5% of their time in New York territory and 12.5% of their time in New Jersey territory. The two vessels traveling directly from New Jersey to Liberty Island and Ellis Island spend approximately 56.25% of their time in New York territory and 43.75% of their time in New Jersey territory. During this peak season, Statue Cruises generally assigns sixteen deckhands to those vessels traveling from New York and seven deckhands to those vessels traveling from New Jersey. Therefore, in sum, defendants assert that members of the proposed class spend approximately 78% of their time in New York and 22% of their time in New Jersey.

Furthermore, defendants contend that the Ninth Circuit's case of *Aubry* is distinguishable from the facts here because this case concerns more than one state's interest, as Statue Cruises's operations involve an interstate ferry service and employees who reside in two different states, rather than one. Defendants further note that Statue Cruises's employees spend the vast majority of their working hours in New York and the company has offices in two states and pays concessions taxes almost exclusively to New York.

In its reply/opposition brief, plaintiff argues that *Strain* and *Coil* were expressly rejected by the Appellate Division, as it chose instead to adopt the analysis in *Aubry*. Further, the plaintiff points out that the *Strain* case involved an international cruise ship company whose employees were assigned to itineraries around the world, with the main route in the case involving Oregon and Washington waters. To further support this argument, plaintiff states that Statue Cruises's vessels, unlike the vessels in *Strain*, are not making international voyages. Moreover, plaintiff asserts that defendants' reliance on *Coil* is misplaced as that court relied upon a flawed analysis, and not upon the "clear and manifest intent" standard applied in *Aubry*.

In response to plaintiff's reply/opposition, defendants contend that plaintiff's savings clause argument, and reliance upon the cited cases, is misplaced. Defendants argue that the cases cited to by plaintiff, which have analyzed and discussed the issue of whether the savings clause applies, involved commerce within a single state's borders or the interest of only one state. In this matter, defendants assert, there is a conflict between the laws of two or more states.

In light of the foregoing arguments and case law presented, this Court finds that because defendants' operations involve interstate commerce over federal waters, federal admiralty law shall apply. Therefore, federal law preempts the NJWHL.

In reaching this conclusion, the court finds that this case is more analogous to *Strain* and *Coil* than to *Aubry*. While plaintiff strongly urges this court to adopt the analysis set forth by the Ninth Circuit in *Aubry*, and further asserts that the Appellate Division has instructed this court to follow the Ninth Circuit's holding, the Appellate Division specifically stated that "[t]he court's pre-emption analysis in *Aubry, though not controlling*, is instructive insofar as the court engaged in a fact-sensitive analysis in order to determine whether 'the application of a state's over-time law will ... disrupt international or interstate commerce.'" *Flecker, supra*, slip op. at 30–31.

Furthermore, and most persuasive to this court's reasoning, is that the Ninth Circuit understood the importance of uniformity in admiralty law, and noted in *Aubry* that the issue raised posed a "difficult question," despite the fact that there was no inter-coastal commerce and all employees resided within the same state. *Aubry, supra*, 918 *F*.2d at 1424. Indeed, when confronted with facts more similar to the facts of this case, the Ninth Circuit declined to extend its holding in *Aubry* to its holding in *Fuller v. Golden Age Fisheries*, 14 *F*.3d 1405 (9th Cir.1994). In *Fuller*, the Ninth Circuit concluded that the FLSA pre-empted claims under the Alaska minimum wage and overtime statute. *Ibid.* The Ninth Circuit held that "[u]nlike the crewmembers in *Aubry*, plaintiffs

[in *Fuller*] were engaged in coastwise voyages and their predominate job situs was the high seas rather than the territorial waters of Alaska." *Id.* at 1409 ("The Ninth Circuit further explained that in *Aubry*, because the plaintiffs were residents of California who did not engage in 'foreign, intercoastal or coastwise voyages,' application of the California labor statutes would not interfere with uniform application of federal admiralty law.")

Thus, in performing the same type of analysis the Ninth Circuit performed in *Aubry*, which the Appellate Division has instructed this court to apply, the court finds that the facts in *Aubry* are unequivocally distinct from the facts presented here. As explained in *Strain, Coil, Fuller*, and in defendants' motion papers, this matter involves an operation entailing interstate commerce, on federal waters, with employees who reside and work in two different states. In addition, Statue Cruises also maintains offices in two different states. As evidenced in both parties' briefs, Statue Cruises's vessels operate between New York and New Jersey. Statue Cruises has two routes between Liberty Island and Ellis Island, with the primary route running from Battery Park in New York to Liberty Island, to Ellis Island and then back to Battery Park, and the other route running from Liberty State Park in New Jersey to Ellis Island and then to Liberty Island and back to Liberty State Park. In addition, although Statue Cruises's administrative offices are located in New Jersey, it also maintains a ticket and a guest services office in New York, and over 53% of Statue Cruises's employees are residents of New York (of the 109 Class Members, fifty-eight are New York residents and fifty-one are New Jersey residents). Moreover, the percentage of time analysis presented by defendants establishes that an employee spends more time in New York than in New Jersey. What the Court finds most compelling from this information, however, is the fact that in any one typical work day, an employee is working in both New York and New Jersey. Thus, two states' interests are clearly involved.

Additionally, the Appellate Division instructed this court to make specific findings regarding whether the application of the

NJWHL would prove so disruptive that federal law should preempt New Jersey law. Defendants' principal argument in applying New Jersey law is the fact that such a decision would result in an "accounting chaos." Plaintiff contends that there would be no such disruption should New Jersey law apply, because all of the employees work for a New Jersey corporation, all employees of the class pay New Jersey withholding payroll taxes, and sophisticated payroll services companies can simply compute the hours and wages for each employee. With respect to this issue, the court agrees with defendants' position.

Similar to the court in *Strain*, this court finds that to pay each worker according to the laws of the worker's home state would indeed create a nightmarish accounting prospect. "The potential disruption of the uniformity and harmony of the maritime law is clear." *Strain, supra*, 70 *P*.3d at 259. The evidence reveals that no class members work more than forty hours in any one week in New Jersey. Rather, as noted previously, members of the class spend approximately 78% of their time in New York and only 22% of their time in New Jersey. Thus, the Court finds that the clear disparity in the amount of time spent in any one state does create a very difficult accounting problem, and will, therefore, disrupt the harmony and uniformity that was intended with the establishment of federal admiralty law. In performing a balancing test, the Court determines that in this case, the state's interest must yield to federal jurisdiction.

In sum, the court concludes that the facts presented here are more similar to those in *Strain, Coil*, and *Fuller* rather than *Aubry*, as the Class Members engage in interstate voyages over federal waters, thereby involving the interests of two states, and thus warranting the preemption of New Jersey Wage and Hour Law by federal law.

## II. *Choice of Law*

Assuming, *arguendo*, that this court or the Appellate Division were to conclude otherwise, and find that the FLSA does not

preempt a state's wage and hour law, it would then need to be determined which state law, New Jersey's or New York's, is more appropriate to be applied in this matter.

A choice of law analysis is critical to this matter because, unlike in New Jersey, New York's Wage and Hour Law (as well as the FLSA) has a specific provision that exempts seamen from overtime pay. *See* 12 *NYCRR* 142–2.2; *N.J.S.A.* 34:11–56a4. Thus, if New York's law is to be applied, the Class Members would only be entitled to overtime pay for any hours worked in excess of forty-eight hours per week.

 Choice-of-law determinations are made in accordance with the law of the forum state. *Moper Transp., Inc. v. Norbet Trucking Corp.*, 399 *N.J.Super.* 146, 153–54, 943 *A.*2d 873 (App. Div.2008). New Jersey now applies a "governmental interest" analysis. *Fu v. Fu*, 160 *N.J.* 108, 118, 733 *A.*2d 1133 (1999). The "first prong" of that analysis requires a determination that an actual conflict exists between the laws of New York and New Jersey, which is to be decided "on an issue-by-issue basis." *Rowe v. Hoffman–LaRoche Inc.*, 189 *N.J.* 615, 621, 917 *A.*2d 767 (2007). "The second prong of the governmental-interest analysis requires the [c]ourt to determine which state has the most significant relationship to the occurrence and the parties," *Fu, supra*, 160 *N.J.* at 119, 733 *A.*2d 1133, "or most significant connections with the issues raised or the parties and the transaction[.]" *Lonza, Inc. v. The Hartford Acc. & Indem. Co.*, 359 *N.J.Super.* 333, 342, 820 *A.*2d 53 (App.Div.2003).

Plaintiff asserts that New Jersey law is the only law that can be applied to this matter. Plaintiff further points out that in the employment context, New Jersey State and federal courts have repeatedly held that the applicable law is that of the state of employment. *See Peikin v. Kimmel & Silverman*, 576 *F.Supp.*2d 654, 657 (D.N.J.2008) ("New Jersey Courts have consistently applied the law of the state of employment to claims of workplace discrimination"); *see also Shamley v. ITT Corp.*, 869 *F.*2d 167, 172 (2d Cir.1989) (court applied New York law because though plaintiff

was a resident of New Jersey, he worked in New York his entire career, the employer was headquartered in New York, and the discharge occurred in New York); *Littman v. Firestone Tire & Rubber Co.*, 709 *F.Supp.* 461, 469 (S.D.N.Y.1989) (court applied New Jersey law because plaintiff was based in defendant's New Jersey office, the discharge took place out of that office, and New Jersey was the place of employment).

Plaintiff further asserts that defendants have minimal contacts with New York, aside from the fact that they operate a ticket office in New York. Moreover, "the mere fact that an employee spends time in another state while performing his/her duties (here, it is alleged that the Class Members spend a majority of their work time in New York), or an employer conducts business or generates revenue there, does not create an issue of confusion as to the applicable law." In support of his position, plaintiff cites to *Peikin*, wherein the district court rejected the argument that the amount of business a claimant conducts in the state is a factor in considering whether a claim can be asserted under the New Jersey Law Against Discrimination. *Peikin, supra,* 576 *F.Supp.*2d at 657. Plaintiff also points out that the Statue Cruises's Human Resources Director, Curt Muller, and Chief Operating Officer, Michael Burke, have confirmed that Statue Cruises's operation is based in Jersey City, New Jersey. Lastly, plaintiff states that Statue Cruises withholds New Jersey state payroll taxes for all class members regardless of their state of residence.

In response, defendants urge this court to apply the federal overtime scheme of the FLSA and argue that neither New Jersey nor New York's wage-hour laws should apply because of the overarching federal admiralty, maritime and interstate commerce concerns presented in this case. However, if a choice of law analysis is considered, the defendants contend that all of the Class Members spend the vast majority of their working time in New York territorial waters (78% in N.Y. territory and 22% in NJ territory), ten of its twelve vessels are registered in New York and 94% of the sales taxes collected from concession sales on the

vessels are paid to New York. Defendants also note that no Class Member has ever worked more than forty hours a week in New Jersey. Moreover, although defendants acknowledge that all Class Members have New Jersey employment taxes withheld from their paychecks, they contend that this factor has never been a determinative factor in any applicable case law. In addition, defendants assert that the vessels sail almost exclusively in New York waters, are in New York while docked and touch New Jersey territory only for a few minutes while docked at Ellis Island or Liberty State Park.

Furthermore, defendants argue that plaintiff's reliance on the case law cited is inaccurate as the law of the state of employment has only been consistently applied with respect to workplace discrimination. *See Peikin, supra,* 576 *F.Supp.*2d at 654. In general, defendants assert that the facts presented in those cases are distinguishable from the facts here, because neither case was confronted with applying New Jersey law in a situation where there are competing interests of both federal admiralty law and a sister state's overtime pay legislation.

The court disagrees with defendants' analysis and is more persuaded by plaintiff's arguments. Although defendants are correct that the cases relied upon by plaintiff have only dealt with issues within the context of workplace discrimination, the court finds no basis to disregard the analysis set forth in each of those cases as the reasoning is instructive to this analysis.

Thus, based upon the arguments set forth by plaintiff, the court finds that if it were to be determined that federal law does not preempt state law, then the NJWHL is the more appropriate law to be applied in this matter. While the court does recognize that all of the Class Members spend a considerable amount of their working time in New York, such a factor has not been found to be dispositive on the issue of whether one state's law is better suited over another. *See D'Agostino v. Johnson & Johnson, Inc.,* 133 *N.J.* 516, 526, 628 *A.*2d 305 (1993) (citing *Veazey v. Doremus,* 103 *N.J.* 244, 510 *A.*2d 1187 (1986) (determinative law is "that of the

state with the greatest interest in governing the particular issue" and the "qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply")); *see also Peikin, supra,* 576 *F.Supp.*2d at 657 (there is no authority cited to suggest that the amount of business a claimant conducts in the state is a factor in considering whether a claim can be asserted under the NJLAD).

Based on this analysis, this court finds that New Jersey has a significant relation to the occurrence and parties involved in this matter. Despite the fact that ten of twelve vessels are registered in New York and that defendants have a guest services and ticket office within the State of New York, the defendants' primary office is located New Jersey; defendants withhold New Jersey payroll taxes from all employees regardless of whether the employee resides in New Jersey or New York, and each employees' work does, in part, take place in New Jersey. *See McDonnell v. Ill.,* 319 *N.J.Super.* 324, 340–341, 725 *A.2d* 126 (App.Div.1999) (court applied New Jersey law on the basis that plaintiff was a New Jersey resident, three of the individual defendants are New Jersey residents, the employer maintained an office in New Jersey, and the basis of the claims arose from New Jersey); *see also Littman, supra,* 709 *F.Supp.* at 469 (S.D.N.Y.1989) ("The evidence shows that, although plaintiff was a New York resident and some of his work was done [in New York], his office was, at all times, in New Jersey, where he was also formally discharged."); *Zanfardino v. E–Sys., Inc.,* 652 *F.Supp.* 637, 639–40 (S.D.N.Y.1987) (applying law of state where … employment contract was negotiated, defendant's main offices were, and termination decision was made, even though employee worked elsewhere).

Moreover, it is evident from the enactment of New Jersey's wage laws that the Legislature had a strong interest in protecting its workers, as New Jersey courts have consistently held that all exemptions under the State's wage laws should be construed narrowly. *See Marx, supra,* 380 *N.J.Super.* at 302, 882 *A.2d* 374; *see also Comfort Cab, Inc., supra,* 118 *N.J.Super.* at 175, 286 *A.2d*

742 (Wage and Hour Law is humanitarian and remedial legislation, requiring any exemption to be narrowly construed).

Therefore, this court finds that because New Jersey has the most significant relationship to the occurrence and the parties, as well as a significant connection with the issues raised, it has a legitimate governmental interest to have its Wage and Hour Law applied.

In conclusion, this court finds, assuming *arguendo* that a choice of law analysis is necessary, the appropriate law to be applied in the instant matter is the NJWHL.

### III. *CEPA and NLRB*

The next issue the court will address is whether plaintiff's claim under the New Jersey Conscientious Employee Protection Act (CEPA) is preempted by the NLRA. Although the Appellate Division did not ask the court to make any specific findings on this issue, the defendants asked for the opportunity to re-brief and argue it, which this court allowed.

In brief, plaintiff contends that this matter was not brought under the NLRA, does not raise any issues under the NLRA, and involves a statute that is deeply rooted in New Jersey and has no federal consequences. By contrast, defendants assert that plaintiff's initial class action complaint regarding overtime constitutes "concerted activity" protected by Section 7 of the NLRA and that plaintiff's CEPA claim, alleging retaliation for engaging in concerted activities, is arguably an unfair labor practice prohibited by Section 8 of the NLRA.

In *Garmon*, the United States Supreme Court held that "[w]hen an activity is arguably subject to [§ ]7 or [§ ]8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 *U.S.* 236, 79 *S.Ct.* 773, 3 *L.Ed.*2d 775 (1959). The broad preemption rule in *Garmon*, however, does not apply when

the arguably protected or prohibited activities "touch interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 244, 79 *S.Ct.* 773.

Section 7 of the NLRA protects the right of employees to "assist labor organizations" and "to engage in other concerted activities." 29 *U.S.C.* § 157. Section 8 of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in Section 7, and "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subsection." *Id.* §§ 158(a)(1), (4).

The phrase "concerted activity" is not defined within the NLRA. *NLRB v. City Disposal Sys.*, 465 *U.S.* 822, 831, 104 *S.Ct.* 1505, 79 *L.Ed.*2d 839 (1984). However, two related decisions of the National Labor Relations Board provide guidance. In *Meyers Indus., Inc. v. Prill*, 268 *N.L.R.B.* 493, 497 (1984) (footnote omitted), the Board stated that an employee's action may be deemed "concerted" for purposes of Section 7 only if the action is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." In *Meyers Industries, Inc.*, the Board explained that its objective standard of concerted activity "encompasses those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." *Meyers Indus.*, 281 *N.L.R.B.* 882, 887 (1986); *see also Williams v. Watkins Motor Lines, Inc.*, 310 *F.*3d 1070, 1072 (8th Cir.2002) ("[I]ndividuals acting on their own behalf are not engaged in concerted activity"). However, the Supreme Court, in its *City Disposal* decision, broadened the scope of "concerted activity" to encompass "a lone employee's invocation of a right grounded in his collective-bargaining agreement." *City Disposal, supra,* 465 *U.S.* at 833, 104 *S.Ct.* at 1512, 79 *L.Ed.*2d at 850.

Plaintiff's principal argument with respect to this issue is that New Jersey's enactment of CEPA "touch[es] interest[s] deeply rooted in local feeling and responsibility," such that plaintiff's claim should not be pre-empted. *See Garmon, supra*, 359 *U.S.* at 243–244, 79 *S.Ct.* at 779, 3 *L.Ed.*2d at 782 (1959); *see also Mehlman v. Mobil Oil Corp.*, 153 *N.J.* 163, 179, 707 *A.*2d 1000 (1998) (noting New Jersey's Conscientious Employee Protection Act was described at the time of its enactment as the most far-reaching "whistleblower statute" in the nation). Moreover, plaintiff relies upon the United States Supreme Court's refusal to apply the *Garmon* pre-emption in a literal, mechanical fashion. The Supreme Court stated that, "cases indicate, however, that inflexible application of the doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." *Farmer v. United Bhd. of Carpenters & Joiners of Am., Local 25*, 430 *U.S.* 290, 302, 97 *S.Ct.* 1056, 1064, 51 *L.Ed.*2d 338, 351 (1977).

Further, plaintiff argues that the United States Supreme Court has held that preemption under federal law cannot be invoked when a state statute creates an independent right to recovery, even when the underlying facts of the state-based cause of action are similar to the federal claim. *Metro. Life Ins. Co. v. Mass.*, 471 *U.S.* 724, 755, 105 *S.Ct.* 2380, 2397, 85 *L.Ed.*2d 728, 750 (1985) ("It would turn the policy that animated [federal law] on its head to understand it to have penalized workers who have chosen to join a union by preventing them from benefiting from state labor regulations imposing minimal standards on nonunion employers.")

Plaintiff further asserts that courts have routinely held that *Garmon* preemption does not apply to state-based employment laws given the states' strong public policy underlying these laws. Plaintiff relies upon the language and holding set forth by the Supreme Court of Washington, wherein the Court stated:

While it is clear than an NLRB inquiry would focus on whether the plaintiffs' overtime wage claims were protected "concerted activity," the state cause of action focuses instead on whether the employees were discharged in retaliation for their

overtime claims. Thus, the controversy presented to the state court is different from that which could have been, but was not, presented to the Labor Board.

[*Hume v. Am. Disposal Co.*, 124 *Wash.*2d 656, 880 *P.*2d 988, 993 (1994).]

*See also Domnister v. Exclusive Ambulette, Inc.*, 607 *F.*3d 84, 87 (2d Cir.2010) (Plaintiff only raises state-law and city-law claims and does not rely upon or address (or even mention) any collective bargaining agreement.).

Moreover, plaintiff does not claim to be entitled to coverage under any agreement, or to have acted in concert. Plaintiff also cites to the following cases that have held that state employment laws are not subject to *Garmon* preemption. *See, e.g., Vaughn v. Pac. Nw. Bell*, 289 *Or.* 73, 611 *P.*2d 281, 287 (1980) (The prevention of employment discrimination against workers receiving a state administered compensation award is a matter of particular state responsibility and concern); *Bald v. RCA Alascom*, 569 *P.*2d 1328, 1332 (Alaska 1977) (State employment practices laws have also been held to reflect strong local interests which ought to be recognized if at all possible); *Goodyear Tire & Rubber Co. v. Dept. of Indus., Labor and Human Relations*, 87 *Wis.*2d 56, 273 *N.W.*2d 786, 799–800 (Ct.App.1978) (Sex discrimination in Wisconsin touches interest deeply rooted in this state, which has prohibited sex discrimination in employment since 1961 and has promulgated a massive amount of legislation forbidding sex discrimination).

Lastly, plaintiff argues that because he did not pursue any claims under the NLRA, the *Garmon* pre-emption does not even apply. In support, plaintiff cites to *Paige v. Henry J. Kaiser Co.*, 826 *F.*2d 857, 862 (9th Cir.1987), wherein the Ninth Circuit held that by foregoing their claim based on federal law, the appellants may choose to plead their action as a state claim, thus the *Garmon* analysis is therefore not relevant.

In response, defendants assert that in determining whether the complained of activity at issue in the state-based claim is similar to activity that is arguably prohibited by the NLRA, the United States Supreme Court held that:

The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to ... or different from ... that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.

[*Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters,* 436 *U.S.* 180, 197, 98 *S.Ct.* 1745, 1757, 56 *L.Ed.*2d 209, 226 (1978).]

Defendants contend that plaintiff's actions are undoubtedly concerted activity as the plaintiff could have brought an individual complaint for only his own overtime compensation, but instead filed this class action lawsuit on behalf of himself and all similarly situated employees. *See Smith v. Excel Maint. Servs., Inc.,* 617 *F.Supp.*2d 520, 524 (W.D.Ky.2008) (finding retaliation claim preempted and noting that the NLRA does not only protect labor disputes concerning union activity, but also applies to "concerted activities concerning conditions of employment by unorganized employees"); *see also N.L.R.B. v. Coca Cola Bottling Co. of Buffalo, Inc.,* 811 *F.*2d 82, 88 (2d Cir.1987) (Mutual aid or protection clause under § 7 was intended broadly to protect activities beyond grievance settlement, collective bargaining and self-organization; it also extends to protect employees' efforts to "improve their lot as employees through channels outside the immediate employee-employer relationship").

Moreover, defendants argue retaliation against an employee for raising a collective concern about proper wages is not "a matter of purely local concern," which, contrary to plaintiff's assertions, is actually an extremely narrow exception to the *Garmon* doctrine. In support, defendant cites to *Wright v. Nesor Alloy Corp.,* No. 03–CV–1789, 2006 *WL* 2830969 at *10 (D.N.J. Sept. 29, 2006), wherein the district court held that plaintiff's CEPA claim was preempted under *Garmon* where the activities forming the basis of the CEPA claim—namely, alleged retaliation against plaintiff for invoking his rights to overtime pay in letters to his employer—constituted concerted activities protected by § 7 of the NLRA. *Id.* at *10.

Defendants further contend that the *Garmon* exceptions, relied upon by plaintiff, are to be applied narrowly only to those actions involving accusations of violence, threats or attacks. *CFM Assocs., Inc. v. Int'l Broth. of Elec. Workers Local,* No. A-4261-08T3, 2010 *WL* 772841, at *7 (N.J.Super.App.Div. March 3, 2010) (citing *Belknap, Inc. v. Hale,* 463 *U.S.* 491, 103 *S.Ct.* 3172, 77 *L.Ed.*2d 798 (1983)). Defendants argue that the Supreme Court in *Belknap* noted that the *Garmon* exceptions applied to issues such as malicious libel and intentional infliction of emotional distress. *Belknap, supra,* 463 *U.S.* at 533 n. 7, 103 *S.Ct.* at 3195 n. 7, 77 *L.Ed.*2d at 829 n. 7.

Lastly, defendants assert that the decision in *Hume,* which plaintiff relies upon, is erroneous. Defendants cite to *Kilb v. First Student Transportation, LLC,* 157 *Wash.App.* 280, 236 *P.*3d 968, 975 (2010), in which the court held that "even where a clear state public policy exists, a state claim will be pre-empted where Congress intended to deprive states of the power to act."

Based upon the foregoing arguments and case law presented, this court finds that plaintiff's CEPA claim is not preempted by the NLRA as New Jersey's CEPA does touch upon interest so deeply rooted in local feel and responsibility. As highlighted in plaintiffs' argument, New Jersey's enactment of CEPA was the most far reaching "whistleblower statute" in the nation. *Mehlman, supra,* 153 *N.J.* at 163, 707 *A.*2d 1000 (CEPA is considered to have "broad" protections). *See also Abbamont v. Piscataway Twp. Bd. of Educ.,* 138 *N.J.* 405, 418, 650 *A.*2d 958 (1994) ("Both CEPA and LAD effectuate important public policies. Each seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers"). Additionally, the New Jersey Supreme Court has repeatedly expanded the definition of what constitutes a "clear mandate of public policy." *See, e.g., Maimone v. City of Atl. City,* 188 *N.J.* 221, 239–240, 903 *A.*2d 1055 (2006) (Employees can now seek the protection of CEPA against retaliation for merely disagreeing with an employ-

er's policies or for assuming that an employer is directing the business in an irresponsible direction without any proof to substantiate that assumption); *Higgins v. Pascack*, 158 *N.J.* 404, 424–425, 730 *A.*2d 327 (1999) (Employees have been protected against retaliation for making false accusations about coworkers' behavior and for insubordination). Lastly, "[b]ecause CEPA is 'remedial legislation,' it 'should be construed liberally to effectuate its important social goal' . . . 'to encourage, not thwart, legitimate employee complaints.'" *Donelson v. DuPont Chambers Works*, 206 *N.J.* 243, 256, 20 *A.*3d 384 (2011) (citations omitted).

In light of the foregoing, it is evident that New Jersey has a strong public policy interest in protecting and encouraging employees to report what they reasonably believe to be illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct. *See Abbamont, supra,* 138 *N.J.* at 431, 650 *A.*2d 958. Thus, because New Jersey has a substantial interest in regulating the conduct at issue, inflexible application of the *Garmon* doctrine is to be avoided. *Farmer, supra,* 430 *U.S.* at 302, 97 *S.Ct.* at 1064, 51 *L.Ed.*2d at 351.

Furthermore, this court finds, as did the Supreme Court of Washington in *Hume,* that while it is clear that an NLRB inquiry would focus on whether the plaintiff's overtime wage claims were protected "concerted activity," the state cause of action focuses instead on whether the employees were adversely treated in retaliation for their overtime claims. *Hume, supra,* 880 *P.*2d at 993. Thus, the controversy presented to the state court, with respect to the CEPA claim, is different from that which could have been presented to the Labor Board.

Moreover, as the defendants noted in their argument, the *Garmon* exception is to be applied narrowly and only in instances of violence, threats or attacks. *See CFM Assocs., Inc., supra,* 2010 *WL* 772841 at *7 (citations omitted). Here, the court does find that plaintiff's CEPA claim fits within that narrow corridor because defendants' October 1, 2009, memo rose to the level of a

threat, as the memo was intended to deter employees from pursuing or even being associated with this suit. Based upon the explicit statements in the memo, it is reasonable to conclude that that defendants attempted to use the threat of reducing union employees' work hours in order to limit the number of supporters and ultimately place plaintiff in a position to withdraw his complaint in its entirety. *See Flecker, supra,* slip op. at 3. (The memo informed the union employees that it will not schedule them to work more than forty hours per week until the issues raised in the complaint were resolved.).

Finally, in promoting its remedial purpose, the Legislature has made available to prevailing parties all remedies under common law tort actions, and most notably, unlike most tort violations, there is no cap or limit on the amount of an award for punitive damages. *See N.J.S.A.* 34:19-5. Under the NLRA, on the other hand, the available remedies are limited. The NLRA provides that the Board, upon a finding that an unfair labor practice has been committed, "shall issue . . . an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay[.]" 29 *U.S.C.* § 160(c). Thus, finding that plaintiff's CEPA claim is preempted by the NLRA would directly contravene this State's goal of prohibiting and deterring employers from retaliatory conduct against their employees.

Therefore, in light of New Jersey's strong public interest, this court finds that plaintiff's CEPA claim is not pre-empted by the NLRA.

Accordingly, in finding that plaintiff's CEPA claim is not pre-empted by the NLRA, the issue of whether plaintiff's CEPA claim is time barred under the NLRA is moot. Therefore, the court will not address this issue.

*Conclusion*

In sum, the court finds that plaintiff's wage and hour claim is preempted by federal law. However, assuming *arguendo* that

federal law does not preempt plaintiff's wage and hour claim, the court finds that the appropriate choice of law is New Jersey's. Lastly, the court finds that plaintiff's CEPA claim is not preempted by the NLRA.